**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-4563**

UNITED STATES OF AMERICA,

　　　　　　Plaintiff - Appellee,

　　　v.

TOMMY ZEKE MINCEY,

　　　　　　Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Statesville. Richard L. Voorhees, District Judge. (5:05-cr-00252)

Argued: September 23, 2008　　　　Decided: November 24, 2008

Before NIEMEYER, Circuit Judge, HAMILTON, Senior Circuit Judge, and T. S. ELLIS, III, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by unpublished opinion. Senior Judge Ellis wrote the opinion, in which Judge Niemeyer and Senior Judge Hamilton joined.

**ARGUED:** Kevin Andre Tate, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Claire J. Rauscher, Executive Director, Emily Marroquin, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Gretchen C. F. Shappert, United States Attorney, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

ELLIS, Senior District Judge:

Appellant, Tommy Zeke Mincey ("Mincey"), appeals his conviction by a jury for possession with intent to distribute at least 100 grams of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2.  At issue in this appeal are the following questions:

(i)     whether appellant, as an unauthorized driver of a rental vehicle, had a legitimate expectation of privacy in the rental vehicle, thus entitling him to contest a warrantless search of the vehicle on Fourth Amendment grounds,

(ii)    whether verbal consent of the rental company provided an independent basis for the warrantless search of the vehicle,

(iii)   whether the scope and duration of the vehicle stop satisfied Fourth Amendment constitutional standards, and

(iv)    whether the trial court abused its discretion in admitting into evidence alleged drug courier profile evidence.

For the reasons that follow, we affirm.


I.

The trial record reflects that at approximately 1:33 p.m. on October 3, 2005, Sergeant Randy Cass with the Iredell County Sheriff's Office stopped a 2000 Dodge four-door automobile with Georgia plates traveling south on Interstate 77 near Statesville, North Carolina.  Sergeant Cass effected the stop because he observed the Dodge following the car ahead of it too

3

closely, a violation of North Carolina traffic law. Once both vehicles were stopped on the side of the road, Sergeant Cass exited his police vehicle, walked toward the passenger side of the stopped vehicle, activated his microphone, and then asked the vehicle's driver and sole occupant -- Mincey -- for his driver's license. Mincey produced a Michigan driver's license in the name of Kenyatta Anthony James containing a photo that matched Mincey's physical appearance. Sergeant Cass advised Mincey why he had been stopped and then asked for the vehicle's registration. In response, Mincey produced a rental agreement from the Armada Rental Company, advising Sergeant Cass that the vehicle had been rented by his girlfriend in Georgia and that her name was on the rental agreement.

While Mincey was locating the rental agreement, Sergeant Cass asked him where he was traveling to on that occasion. Mincey responded that he was driving back to Atlanta, Georgia from Newark, New Jersey, where he had been visiting a family member. Mincey further stated that he had recently moved from Michigan to Dunwoody, Georgia and he provided Sergeant Cass with his new Georgia address for use in Sergeant Cass's issuance of a citation. During this initial exchange, Sergeant Cass observed a cell phone in the passenger seat of the rental vehicle, as well as two open containers of energy drinks in the front cup holders. He also recognized, based on his experience and

4

training, that Mincey's reported travel destinations -- Newark and Atlanta -- were known "source cities" for illegal drugs.

At approximately 1:38 p.m., Sergeant Cass returned to his police vehicle with the driver's license and rental agreement that had been provided by Mincey, intending to verify the information provided to him and then to issue Mincey a warning citation for following the car ahead of him too closely. Although writing such a citation would typically take Sergeant Cass approximately five minutes, the stop required additional time in this instance because Sergeant Cass was unable to verify the validity of Mincey's Michigan driver's license through the law enforcement communications system, a standard step in the citation process. Specifically, Sergeant Cass first attempted to verify Mincey's license using the listed driver's license number, which the system revealed was not on file. Sergeant Cass then performed a search using the name on the driver's license -- Kenyatta Anthony James. Again, the system disclosed no Michigan driver's license in that name. Sergeant Cass also ran a search for the rental vehicle's Georgia license plates and confirmed that they were indeed registered to the vehicle in question; this check also confirmed that the vehicle was owned by the Armada Rental Company. In the meantime, while performing these information checks, Sergeant Cass began writing the

warning citation using the driver's license and residence information that Mincey had provided.

At approximately 1:50 p.m., Sergeant Cass called the Armada Rental Company and spoke with a woman named Chris to explain the situation, namely that he had stopped one of the company's rental vehicles on the highway for a traffic violation and that the driver and only occupant of the vehicle did not appear to be an authorized driver under the rental agreement. Sergeant Cass confirmed with Chris that Mincey was an unauthorized driver under the rental agreement, which Chris was able to review on the company's computer system. Sergeant Cass then asked Chris for consent to search the vehicle. In response, Chris advised that she would need to speak with a manager and that someone from the rental agency would need to call him back. Sergeant Cass then gave Chris his cell phone number.

At approximately 1:55 p.m., an additional officer -- Sergeant Elliott -- arrived at the scene.[1] At this point, Sergeant Cass turned his microphone off in order to update Sergeant Elliott on his efforts to confirm the authenticity of the Michigan driver's license as well as Mincey's status as an unauthorized driver of the rental vehicle. At around this time, and while Sergeant Cass's microphone was off, another woman from

---

[1] A third officer, Sergeant Byrd, arrived shortly thereafter.

the rental company, Kari Peabody, called Sergeant Cass on his cell phone. During the course of this conversation, Peabody instructed Sergeant Cass that the rental vehicle could not be released to Mincey, since he was an unauthorized driver under the rental agreement. (J.A. 79). Peabody further advised that the officers had permission to impound the vehicle or "to do whatever [they] needed to do." (J.A. 128). Sergeant Cass also asked Peabody if he could search the vehicle. According to Sergeant Cass's uncontradicted testimony, Peabody put the phone down briefly, apparently spoke with someone else at the rental company, then advised Sergeant Cass, "yes, go ahead." (J.A. 129).[2]

At approximately 2:01 p.m., Sergeant Cass exited his police vehicle and walked back to the passenger side of the rental vehicle. He reactivated his microphone and asked Mincey to step outside of the rental vehicle so that he could explain the

---

[2] Sergeant Cass testified both during the suppression hearing and in the course of the trial that Peabody gave him verbal consent to search the rental vehicle. Peabody, in contrast, who testified only at the suppression hearing, stated only that she did not recall giving Sergeant Cass permission to search the car during the course of their telephone conversation. She also was not able to recall any specifics of what she told Sergeant Cass to do with the rental vehicle. In the circumstances, the district court found Sergeant Cass's uncontradicted testimony to be credible and thus found that the rental company had verbally consented to the search of the vehicle. (J.A. 246-47).

7

situation to him. Sergeant Cass then returned the Michigan driver's license to Mincey and handed him the warning citation, which Sergeant Cass had issued using the name on the Michigan driver's license and the Georgia address Mincey had provided. Sergeant Cass then showed Mincey the rental agreement and told him that he had spoken on the telephone with the rental company. Specifically, Sergeant Cass advised Mincey that the vehicle could not be released to his possession because he was not an authorized driver under the rental agreement. In light of this, Sergeant Cass also offered to drive Mincey to the next exit on the highway. Sergeant Cass then told Mincey that he and the other officers were going to search the vehicle and asked Mincey for consent to pat him down for weapons. Mincey consented to the pat down, which revealed a cell phone in his pants pocket.

At approximately 2:03 p.m., Sergeant Cass motioned for Sergeants Elliott and Byrd to assist him with the search of the vehicle. At this point, Mincey asked for permission to return to the vehicle to retrieve a cell phone to call his girlfriend, the authorized driver of the rental vehicle.[3] Sergeant Cass

---

[3] Janelle Crosby, Mincey's purported girlfriend and the authorized driver of the rental vehicle, testified in the course of the suppression hearing that she had rented the vehicle for Mincey because he did not have a credit card to secure the rental. She further testified that she gave Mincey permission to drive the vehicle. Yet, on the rental agreement, when asked to identify the name, age and driver's license number for any (Continued)

8

declined to permit Mincey to return to the vehicle, reminding Mincey that he already had a cell phone in his pocket. Sergeant Elliott then pulled the rental vehicle further off the road for safety purposes and the search began immediately thereafter.

Several minutes into the search, at approximately 2:07 p.m., Sergeant Cass pulled up the console around the vehicle's gearshift, a common site for concealing contraband, and there discovered a plastic bag containing what appeared to him to be illegal drugs. The package had been vacuum-sealed and wrapped in fabric softener sheets and was later confirmed to contain approximately 140 grams of high purity heroin. The search of the interior of the vehicle also revealed (i) three cell phones, in addition to the one located in Mincey's pocket, one of which was an untraceable "boost" phone, (ii) several cell phone chargers, and (iii) MapQuest driving directions from Atlanta, Georgia to Newark, New Jersey that had been printed on October 1, 2005, two days prior to the traffic stop, listing an estimated driving time of nearly 14 hours. Also found in the

---

additional individuals who would be driving the vehicle, Crosby wrote the word "None," and signed her initials. (J.A. 41). The rental agreement expressly provided that the vehicle was not to be used "by any person not specified [in the agreement]" or "in violation of any law, ordinance or regulation." Id.

vehicle's trunk were a pair of bolt cutters and a duffel bag containing clothes and toiletries.

Immediately following discovery of the suspected contraband, Mincey was ordered to the ground and arrested. He was then transported to the narcotics office of the police department.[4] During an initial post-arrest interview with Detective Lieutenant David Ramsey, Mincey continued to identify himself as Kenyatta Anthony James, claiming that the Michigan driver's license was valid and contained his correct name and date of birth. Yet, when further questioned, he twice gave Detective Ramsey an age inconsistent with the date of birth listed on the driver's license.

Later, in the course of subsequent questioning by Sergeant Elliott, Mincey finally identified himself, for the first time, as Tommy Mincey; he also reported a birth date different from the date appearing on the Michigan driver's license.[5] Then, in a

---

[4] Following Mincey's arrest, Sergeant Cass contacted another officer, who then arrived at the scene and drove the rental vehicle to the police station. Thereafter, at approximately 2:38 p.m., Sergeant Cass spoke with a store manager from the rental company and advised him that the rental vehicle was ready and available for pickup at the station.

[5] Law enforcement officers eventually confirmed that the Michigan driver's license Mincey presented in the course of the traffic stop was fraudulent.

voluntary statement to Sergeant Elliott,[6] Mincey provided an explanation for his lengthy travel between Atlanta to Newark and denied any knowledge of the heroin found inside the rental vehicle. In this regard, Mincey stated that on October 2, 2005, he met a Puerto Rican male named "Charles" at the 112 Strip Club in Atlanta. Charles allegedly asked Mincey if he wanted to make some money, and Mincey responded that he did. Mincey then met with Charles across the street from the 112 Strip Club at a bus station, where they allegedly negotiated a price of $5,000 for Mincey to drive Charles from Atlanta to New Jersey. Mincey claimed no further details were discussed about the trip at that time.

According to Mincey, he and Charles left Atlanta in the rental vehicle at approximately 12:00 p.m. on October 2, 2005. Mincey and Charles each drove half the drive to New Jersey and they ultimately arrived at the Cinderella Strip Club in Newark at approximately 1:00 a.m. on October 3, 2005. They entered the club and were inside for approximately 30 minutes, when Charles asked Mincey for the keys to the vehicle. Charles then went

---

[6]     Prior to accepting this voluntary statement, Sergeant Elliott read Mincey his Miranda rights, in the presence of Sergeant Cass, and Mincey then knowingly and voluntarily waived those rights in a written waiver form. (J.A. 481). See Miranda v. Arizona, 384 U.S. 436 (1966). Mincey does not dispute the voluntariness of either his statement or the waiver of his Miranda rights in this instance.

11

outside with the keys and Mincey remained inside the club. Later, when the club closed, Mincey went outside and observed Charles inside a black Mercedes Benz. Charles then told Mincey to drive the rental vehicle back to Atlanta by himself and that he would "settle up" with Mincey on Tuesday at the 112 Strip Club in Atlanta. (J.A. 490). According to Mincey, no further details were discussed. Mincey thus began the drive back to Atlanta at approximately 4:30 a.m. on October 3, 2005, and later that day he was stopped by Sergeant Cass in North Carolina. Mincey claimed he did not know how the heroin got inside the rental vehicle and that he never had any discussions with Charles about illegal drugs. Yet, he did admit to Sergeant Elliott that the four cell phones found on his person and in the rental vehicle on October 3, 2005, all belonged to him.

On October 25, 2005, Mincey was charged in a one-count indictment with possession with intent to distribute at least 100 grams of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2. Mincey filed a motion to suppress the evidence resulting from the October 3, 2005 search of the rental vehicle, arguing that the extended vehicle stop and warrantless search violated his Fourth Amendment rights in various respects. On June 6, 2006, following two days of testimony, the district court denied Mincey's motion to suppress, concluding (i) that the initial traffic stop was valid

12

in that it resulted from a violation of North Carolina traffic laws, (ii) that the length and scope of the investigatory detention was reasonable in the circumstances, (iii) that Mincey did not have standing to contest the warrantless search as an unauthorized driver of the rental vehicle, and (iv) that the rental company consented to the search in any event. (J.A. 246).

On July 12, 2006, following a two-day jury trial, Mincey was convicted as charged, with one count of possession with intent to distribute at least 100 grams of heroin. Mincey was subsequently sentenced on this offense to 150 months imprisonment, to be followed by 8 years of supervised release, with a final Judgment being entered on June 1, 2007. Mincey then filed a timely notice of appeal raising essentially four issues, each of which is addressed here.

## II.

Mincey's first three arguments on appeal concern the district court's denial of his motion to suppress. On appeal, we review legal conclusions underlying the denial of a motion to suppress de novo, and factual findings for clear error. United States v. Moreland, 437 F.3d 424, 429 (4th Cir. 2006) (citing United States v. Johnson, 114 F.3d 435, 439 (4th Cir. 1997)). In this context, "[w]e construe the evidence in the light most

favorable to the Government, the prevailing party below." United States v. Seidman, 156 F.3d 542, 547 (4th Cir. 1998) (citations omitted).

## A.

Mincey first argues that the district court erred in holding that he, as an unauthorized driver under the rental contract, did not have standing to contest the warrantless search of the rental vehicle.[7] As to this issue, it is well settled that only where a search intrudes upon a space as to which an individual has "a legitimate expectation of privacy" may the individual contest the search on Fourth Amendment grounds. United States v. Wellons, 32 F.3d 117, 119 (4th Cir. 1994) (citing Rakas v. Illinois, 439 U.S. 128, 143 (1978)). And, the question whether an expectation of privacy is "legitimate" requires a two-prong test, namely (i) whether the individual had a subjective expectation of privacy in the area searched, and (ii) whether that subjective expectation of privacy is objectively reasonable based on "concepts of real or personal property law" or "understandings that are recognized

---

[7] Although courts continue to use the generic term "standing" in this context, it is clear that the proper legal inquiry is whether the individual at issue had a "legitimate expectation of privacy" in the area searched, as discussed infra. United States v. Wellons, 32 F.3d 117, 119 (4th Cir. 1994) (citation omitted).

14

and permitted by society." <u>Rakas</u>, 439 U.S. at 143, n.12. Although common law concepts of real and personal property are not dispositive of this issue, it is important to note that "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." <u>Id.</u>

Here, Mincey's subjective expectation of privacy in the rental vehicle is not in dispute. Rather, the only question presented is whether his subjective expectation of privacy was objectively reasonable, thus rendering it "legitimate" and entitled to Fourth Amendment protection. As to this issue, our previous decision in <u>Wellons</u> is squarely on point. There, we held definitively that an unauthorized driver of a rental vehicle has no legitimate privacy interest in the vehicle and therefore cannot contest a warrantless search of the vehicle on Fourth Amendment grounds. <u>See</u> <u>Wellons</u>, 32 F.3d at 119 (citations omitted). We further held in <u>Wellons</u> that this conclusion was not altered where, as here, the authorized lessee allows the unauthorized driver to drive the rental vehicle, as an unauthorized driver still does not have permission of the rental company, the owner of the vehicle. <u>Id.</u> at 119 n.2.

Mincey readily acknowledges application of <u>Wellons</u> to the facts presented here, but nonetheless urges us to reconsider <u>Wellons</u> in light of the analyses adopted by several other

15

circuits with respect to the unauthorized rental driver issue. Yet, a review of the applicable case law reveals no persuasive reason to overturn or alter the Wellons holding in this instance.

In this regard, the Fifth, Tenth and Eleventh Circuits appear to be in accord with this circuit in holding that an unauthorized driver of a rental vehicle does not have a legitimate privacy interest in that vehicle for purposes of the Fourth Amendment, regardless of whether the unauthorized driver has the authorized renter's permission to drive the vehicle. See United States v. Riazco, 91 F.3d 752 (5th Cir. 1996); United States v. Roper, 918 F.2d 885 (10th Cir. 1990); United States v. Boruff, 909 F.2d 111 (5th Cir. 1990);[8] United States v. Obregon, 748 F.2d 1371 (10th Cir. 1984); United States v. McCulley, 673 F.2d 346 (11th Cir. 1982). The Eighth and Ninth Circuits take a

---

[8] Mincey cites the Fifth Circuit's decision in United States v. Kye Soo Lee, 898 F.2d 1034 (5th Cir. 1990), as reaching a different result. Interestingly, Boruff and Lee were decided in the same year, although Boruff is the later published opinion. The Fifth Circuit has subsequently noted the apparent conflict between Boruff and Lee, making clear that the holding in Boruff is the general rule followed in the Fifth Circuit. See United States v. Seeley, 331 F.3d 471, 472 n.1 (5th Cir. 2003). In any event, Lee is at least distinguishable in its reasoning in that it does not even address the fact that the hired rental truck drivers in that case were not listed as authorized drivers on the subject rental agreement, analogizing the case instead to one where an individual borrows a personal vehicle from another with the other's consent.

16

different approach, holding generally that an unauthorized driver of a rental vehicle may have a legitimate expectation of privacy in the vehicle for Fourth Amendment purposes if he is able to establish that the authorized renter/driver gave him permission to drive the vehicle, as involved here. See United States v. Muhammad, 58 F.3d 353 (8th Cir. 1995); United States v. Best, 135 F.3d 1223 (8th Cir. 1998); United States v. Thomas, 447 F.3d 1191 (9th Cir. 2006).[9] And finally, the Sixth Circuit has adopted a totality of the circumstances analysis on the issue, holding that permission of the lessee to drive a rental vehicle is but one of many factors to be considered in determining whether an unauthorized driver has a legitimate privacy interest in a rental vehicle. United States v. Smith, 263 F.3d 571 (6th Cir. 2001).

---

[9] Although not necessary to the result reached here, it should nonetheless be noted that this line of cases is factually distinguishable from the case at bar. Indeed, even assuming Mincey had the permission of the authorized renter to drive the rental vehicle in this instance, any such permission clearly terminated once the rental company affirmatively advised Sergeant Cass that Mincey, as an unauthorized driver under the rental contract, was not entitled to possess the vehicle and that the vehicle was not to be released to Mincey at the scene of the traffic stop. In other words, at that moment, any permission that had previously been extended to Mincey by the authorized driver of the rental vehicle was effectively extinguished by the rental company, the actual owner of the vehicle and issuer of the subject rental contract.

17

While recognizing the varying approaches adopted elsewhere, Mincey's argument is appropriately rejected in this instance in light of Wellons.[10]   Nor are we persuaded to depart from our prior precedent in any respect.   Put simply, Mincey, as an unauthorized driver under the Armada rental contract, had no legitimate expectation of privacy in the rental vehicle and cannot contest the warrantless search of the vehicle on Fourth Amendment grounds.   This is especially so where, as here, the rental company, on learning of the vehicle's unauthorized use, instructs that the vehicle is not to be released to the unauthorized driver.

B.

Mincey next argues that the district court erred in denying his motion to suppress on the alternative basis of consent for the search having been given by the rental company, arguing specifically that any consent by the agency did not provide an independent justification for the warrantless search when the vehicle had already been rented to a third party.   In the circumstances, given that Mincey had no legitimate expectation of privacy in the rental vehicle at the time of the warrantless

---

[10]   We have previously reaffirmed our holding in Wellons in several unpublished decisions.   See United States v. Rollack, 173 F.3d 853 (Table), 1999 WL 104806 (4th Cir. Mar. 1, 1999); United States v. Hannah, 168 F.3d 483 (Table), 1998 WL 911709 (4th Cir. Dec. 31, 1998).

18

search, it is unnecessary to reach or decide the issue of consent in this instance.

C.

Mincey next contends that the district court erred in denying his motion to suppress based on the length and scope of the traffic stop and the accompanying investigatory detention. In this regard, Mincey contends that he was detained and questioned by Sergeant Cass beyond the scope of the initial traffic stop without sufficient basis or a reasonable suspicion that he was involved in criminal activity, thus violating his Fourth Amendment rights. See Reid v. Georgia, 448 U.S. 438, 440 (1980).

Mincey is correct that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). It is also clear that in order to detain a driver for investigative purposes beyond the issuance of a traffic citation or warning, an officer must possess "a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid, 448 U.S. at 440

(citations omitted).[11] In evaluating whether an investigative detention is supported by reasonable suspicion in this regard, a reviewing court must consider the totality of the circumstances known to the investigating officer, including the "specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Terry v. Ohio, 392 U.S. 1, 27 (1968).

Here, it is unnecessary to reach the reasonable suspicion analysis, as the scope and duration of the vehicle stop were justified by the time and actions necessary for Sergeant Cass to verify the information contained in the driver's license and rental agreement provided to him by Mincey, a required step in the issuance of a valid citation. Indeed, the record reflects that no more than 35 minutes elapsed from the time Mincey was initially stopped until his ultimate arrest; this time included the search of the rental vehicle. A review of the law enforcement video and microphone recordings of the vehicle stop also confirms the reasonableness of the time and actions necessary for Sergeant Cass to verify Mincey's identity and

---

[11] For purposes of the "reasonable suspicion" analysis, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard...." United States v. Arvizu, 534 U.S. 266, 274 (2002) (citation omitted).

20

unauthorized driver status in this instance.[12]  In the circumstances, therefore, the scope and duration of the vehicle stop did not violate Mincey's Fourth Amendment rights and the district court did not err in denying Mincey's motion to suppress on this ground.[13]

## III.

Mincey's fourth and final argument on appeal is that the district court abused its discretion when it allowed alleged drug courier profile testimony to be admitted as evidence in the course of the jury trial.  In this respect, we note that evidentiary rulings are generally reviewed for abuse of discretion.  United States v. Queen, 132 F.3d 991, 995 (4th Cir.

---

[12] As noted above, such actions included Sergeant Cass's unsuccessful efforts to verify Mincey's Michigan driver's license through the law enforcement communications system, first by number and then by name.  Further time was consumed by Sergeant Cass's reasonable telephone communications with several representatives from the rental company (i) to confirm that Mincey was an unauthorized driver of the subject rental vehicle and (ii) to obtain the rental company's instructions with respect to the vehicle, including, inter alia, their consent to a warrantless search.

[13] Because we find that the duration of the traffic stop was reasonable, we do not need to reach the further issue of whether Sergeant Cass had "a reasonable and articulable suspicion" that appellant was engaged in criminal activity. Reid, 448 U.S. at 440.  We note, however, that the facts presented here are sufficient to support such a finding, particularly with respect to Mincey's fraudulent use of a driver's license. Id.

1997) (citation omitted).  Thus, a trial court's determination to admit evidence should not be disturbed on appeal unless the trial court has acted "arbitrarily or irrationally."  United States v. Jones, 913 F.2d 174, 177 (4th Cir. 1990) (citing United States v. Masters, 622 F.3d 83, 87-88 (4th Cir. 1980)).

We have previously held that it is "clearly impermissible" for the government to attempt "to establish the defendant's guilt by showing that he has the same characteristics as a drug courier."  Jones, 913 F.2d at 177.  Put differently, "the use of expert testimony as substantive evidence showing that the defendant 'fits the profiles and, therefore, must have intended to distribute the . . . [drugs] in his possession' is error." Id. (quoting United States v. Quigley, 890 F.2d 1019 (8th Cir. 1989), cert. denied, 493 U.S. 1091 (1990)).  We nonetheless recognized in Jones that drug courier profile evidence may still be used in appropriate circumstances, including, for example, "as purely background material to explain why the defendant was stopped...[or] to rebut testimony provided by a defendant who claims that he is not a typical drug courier."  Jones, 913 F.2d at 177 (citing United States v. Sokolow, 490 U.S. 1 (1989), United States v. Beltran-Rios, 878 F.2d 1208 (9th Cir. 1989)).

Here, the alleged improper drug courier profile evidence pertained to Mincey's possession of four cell phones at the time of his arrest.  Specifically, Mincey objects to the district

22

court's admission of Sergeant Cass's testimony -- presented in the course of government counsel's re-direct examination -- that drug couriers typically carry multiple cell phones, particularly boost phones, to guarantee that they will have sufficient cellular coverage to stay in contact with the person for whom they are transporting drugs.[14]

While the disputed testimony may arguably be viewed as drug courier profile evidence, the record reflects that the testimony was elicited by government counsel in this instance as rebuttal evidence, consistent with our previous holding in Jones. 913 F.2d at 177. Indeed, in the course of cross-examination, Mincey's counsel asked Sergeant Cass, "Now, with respect to those cell phones, there's nothing illegal about having a cell phone, is there?", to which Sergeant Cass simply responded, "No, sir." (J.A. 373). A review of the trial transcript makes clear that the alleged drug courier profile evidence at issue was

---

[14] In this regard, Sergeant Cass testified that

[a] drug courier is going to have to keep in contact with the person that they're hauling drugs for. They will give them multiple phones to where they can guarantee they're going to have coverage. Anyone that's got a cell phone will know there's some places your phone won't pick up so they'll give them a different type of phone.

(J.A. 379-80). Sergeant Cass further testified that "boost phones have been prevalent" in many of the stops and seizures made by his office. (J.A. 380).

23

thereafter elicited by government counsel during its re-direct examination as a means to rebut Sergeant Cass's testimony regarding the legality of possessing multiple cell phones.[15]  See Jones, 913 F.2d at 177 (recognizing that drug courier profile evidence may be used "to rebut testimony provided by a defendant who claims that he is not a typical drug courier").

In an attempt to avoid this result, Mincey argues that the single question posed to Sergeant Cass by Mincey's counsel on cross-examination regarding the legality of possessing multiple cell phones was necessary given the government's "protracted references [in the course of direct examination] to Mincey's possession of multiple cell phones as being indicia of his knowledge that drugs were in the rental vehicle."  (Appellant

---

[15]  Indeed, the contested testimony was prefaced by the following exchange between government counsel and Sergeant Cass:

> Q.  Do you remember something to the effect [that] there's nothing illegal about having multiple cell phones?
>
> A.  Yes, sir.
>
> Q.  Based on your training and experience, is there a reason for somebody involved in drug activity . . . to have multiple cell phones?
>
> A.  Yes, sir.
>
> Q.  And based on your training and experience, what is the purpose of having multiple cell phones?

(J.A. 379).

Reply Br. 9). Yet, this argument is unpersuasive; a review of the trial transcript makes clear that Sergeant Cass's testimony on direct examination pertaining to Mincey's four cell phones amounted to nothing more than an identification and general description of the various items discovered in the course of the vehicle search conducted in this case. Significantly, no drug courier profile evidence was elicited during the course of Sergeant Cass's testimony on direct examination. Thus, contrary to Mincey's contentions, the government, in its direct examination of Sergeant Cass, did not attempt "to establish the defendant's guilt by showing that he has the same characteristics as a drug courier." Jones, 913 F.2d at 177.

In the circumstances, given that Mincey's counsel opened the door to the contested testimony in the course of his cross-examination of Sergeant Cass, the alleged drug courier profile evidence elicited by the government in the course of its re-direct examination of Sergeant Cass is appropriately viewed as rebuttal evidence consistent with our holding in Jones. Id. The district court, therefore, neither abused its discretion nor acted "arbitrarily or irrationally" in admitting this testimony in the course of Mincey's trial. Jones, 913 F.2d at 177 (citation omitted).

25

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED
