RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0095p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                              *Plaintiff-Appellee,*

                                                    No. 09-5111

           *v.*

HARVEY EVERETT III,
                              *Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 08-00116-001—Thomas A. Wiseman, Jr., District Judge.

Argued: March 3, 2010

Decided and Filed: April 6, 2010

Before: BOGGS and NORRIS, Circuit Judges; and ADAMS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** C. Douglas Thoresen, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. Blanche Bong Cook, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** C. Douglas Thoresen, Michael C. Holley, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. Kelly D. Young, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

BOGGS, Circuit Judge. Defendant Harvey Everett III was convicted of being a felon in possession of a firearm after he volunteered during a traffic stop, in response

---

[*] The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

to the detaining officer's questioning, that he had a shotgun in his car.  He appeals his conviction, arguing that the shotgun should have been suppressed because the officer's questioning on a subject unrelated to his traffic offense violated the Fourth Amendment. This case presents us with an issue of first impression in this circuit: under *Muehler v. Mena*, 544 U.S. 93 (2005), and *Arizona v. Johnson*, 129 S. Ct. 781 (2009), when, if ever, may an officer conduct questioning during a traffic stop that (1) is unrelated to the underlying traffic violation, (2) is unsupported by independent reasonable suspicion, and (3) prolongs the stop by even a small amount?  We hold that the questioning here did not violate the Fourth Amendment, and accordingly, we affirm.

## I

Even before he was arrested, April 15, 2008 was shaping up to be a bad day for Mr. Everett.  That evening, he had helped his estranged wife (with whom he was in the process of obtaining a divorce) move into a new house.  At her insistence, Everett had retrieved some of the possessions that he had been storing with her, including a shotgun. By the time he had finished, it was approximately 8:30 p.m.  This being tax day, however, Everett needed to get to the office of Advance Financial, a tax-preparation company, before closing time – which he believed to be 9:00 p.m. – in order to seek help filing for an extension.

A few minutes before 9:00, Detective Morgan Ford, sitting in her patrol car on a Nashville thoroughfare, saw Everett drive by at a high rate of speed.[1]   Ford was a member of the Nashville Police Department's "Flex Team," which she described as "an aggressive patrol unit designed to make traffic stops and *Terry* stops in high-crime areas to reduce crime."  In other words, as Everett characterizes it, Ford was planning to make "pretext[ual]" traffic stops "with the real purpose of trying to ferret out other types of crime."

Ford followed Everett to the Advance Financial office.  As Everett parked, she pulled up next to him with her lights on and approached his vehicle.  At that point, if not

---

[1]Everett concedes that he was driving five to ten miles per hour over the speed limit.

before, Ford would have seen that Everett was a middle-aged African-American male. She asked Everett (who was still in his car) for his license, registration, and proof of insurance. Everett admitted that his license was suspended, but produced alternate identification and proof that he was in the process of paying off the required fines to get his license back. At that point, Ford "started smelling . . . alcohol" on Everett's breath.[2]

Ford then asked Everett to step out of the vehicle, and he readily complied. Ford did not immediately continue with what she testified was standard traffic-stop procedure – i.e., checking for registration and proof of insurance. Nor did she directly proceed to write Everett a speeding ticket. Instead, Ford at once asked him "if he had anything illegal on his person, any weapons or narcotics or anything like that, or anything illegal in his vehicle." As the government concedes, Ford had no particularized basis to suspect that Everett possessed any weapons, drugs, or other contraband – although she testified that, in her experience, it was "very common . . . for people to have firearms in [their] vehicle after they have been drinking."[3]

Everett responded that he "had an open forty-ounce beer and a .410 shotgun, which . . . he knew he was not supposed to have because he was a convicted felon." Ford asked what his conviction was for, and he answered "drugs." Ford then asked if Everett had "any other weapons or anything else on his person she needed to know about." He said he did not. Ford asked if she could check; Everett agreed. Upon conducting a pat-down, she found two baggies of marijuana in his jacket pocket.

Ford handcuffed Everett, Mirandized him, and placed him in her squad car. She then searched Everett's vehicle, where she found the .410 shotgun, which was unloaded and wrapped in a black trash bag, on the floorboard of the back seat. She also found the

---

[2]Everett admits having drunk a beer or half a beer earlier in the evening. He does not dispute that Ford was able to detect the odor of alcohol.

[3]Although the district court found that Ford had not performed a field sobriety test, it concluded – and the parties do not dispute – that Ford "quickly reached the conclusion that Mr. Everett was not intoxicated." The district court did not state whether Ford reached this conclusion before or after asking Everett the question about contraband. However, given that Ford asked the question immediately after Everett exited his vehicle, we assume that she still suspected Everett might be intoxicated when she asked it. In any event, this assumption is by no means necessary to our disposition of this case.

open forty-ounce beer, as well as a set of digital scales with white powder residue, which field-tested positive for crack cocaine. Because Everett had been so cooperative, Ford decided to "cut [him] a break" on the firearm charge and issued him misdemeanor citations for simple possession of marijuana, possession of drug paraphernalia, and driving on a revoked license. She also issued a traffic citation for careless driving. At that point, Ford released Everett from custody.

Notwithstanding Ford's lenience, the government filed a federal complaint against Everett and, in May 2008, he was indicted on one count of possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g). Everett moved to suppress the evidence and the statements obtained during the traffic stop. On July 14, 2008, the district court initially granted the motion, ruling that, in the absence of independent reasonable suspicion, Ford's questions on matters unrelated to the traffic stop rendered the stop unreasonable under the Fourth Amendment and that the shotgun was therefore "fruit of the poisonous tree." The government filed a motion for reconsideration, and on August 29, 2008, the district court vacated its prior order and denied Everett's suppression motion. Everett entered a conditional guilty plea, reserving the suppression issue for appeal. On January 8, 2009, the district court sentenced Everett to 36 months in prison.

## II

"When reviewing a district court's decision on a motion to suppress, we use a mixed standard of review: we review findings of fact for clear error and conclusions of law de novo." *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009). In particular, "[w]hether a seizure is reasonable under the Fourth Amendment is a question of law that we review de novo." *United States v. Evans*, 581 F.3d 333, 340 (6th Cir. 2009). "When a district court has denied a motion to suppress, [we] review[] the evidence in the light most likely to support the district court's decision." *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009) (internal quotation marks omitted).

## III

Everett does not argue – nor could he – that the traffic stop was invalid at its outset.  Even if Ford's decision to stop him for a traffic violation was a pretext to fish for evidence of other crimes, as the record suggests was the case, "the constitutional reasonableness of traffic stops [under the Fourth Amendment does not] depend[] on the actual motivations of the individual officers involved." *Whren v. United States*, 517 U.S. 806, 813 (1996).  Everett admits that he was speeding, and this alone is enough to render the stop lawful under the Fourth Amendment at its initiation.

## IV

Of course, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  We must therefore determine whether Ford's execution of the traffic stop complied with the standard for temporary detentions set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny.  *See United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (stating that "the principles announced in *Terry v. Ohio* apply to define the scope of reasonable police conduct" during traffic stops (internal citation omitted)).[4]

To qualify as reasonable seizures under the Fourth Amendment, *Terry* detentions must be "limited in [both] scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also United States v. Hensley*, 469 U.S. 221, 235 (1985) (stating that "length and intrusiveness" of a stop are relevant to *Terry* analysis).  Under *Terry*'s duration

---

[4]We note that the Supreme Court has never squarely held that the permissible scope of all traffic stops is governed by *Terry*.  In *Berkemer v. McCarty*, 468 U.S. 420 (1984), the Court observed that in duration and atmosphere, "the usual traffic stop is more analogous to a so-called *Terry* stop than to a formal arrest." *Id.* at 439 (internal citation omitted).  In a footnote, however, the Court cautioned that it was "not suggest[ing] that a traffic stop *supported by probable cause* [as opposed to reasonable suspicion] may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop." *Id.* at 440 n.29 (emphasis added); *accord United States v. Childs*, 277 F.3d 947, 953 (7th Cir. 2002) (en banc) (stating that "although traffic stops usually proceed like *Terry* stops, . . . traffic stops *supported by probable cause* are arrests, with all the implications that follow . . . ." (emphasis added)).  More recently, however, a unanimous Court noted "*Terry*'s application in a traffic-stop setting" and analyzed a traffic stop as an "investigatory stop" rather than an arrest, even though there was no question that probable cause for the stop existed. *Johnson*, 129 S. Ct. at 784.  In any event, we are bound by this circuit's unqualified holding in *Hill* – itself a case where probable cause existed – that traffic stops are governed by *Terry*.  195 F.3d at 264.

prong, a stop "must . . . last no longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500. Under its scope prong, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Ibid.*; *see also United States v. Sharpe*, 470 U.S. 675, 682 (1985) (stating that stop must be "reasonably related in scope to the circumstances which justified the interference in the first place").

In this case, the district court initially concluded that Ford violated *Terry*'s scope prong by inquiring about weapons or narcotics in the absence of independent reasonable suspicion of a *firearm* or *drug* offense. At first blush, this conclusion has some appeal: arguably, questions about weapons or drugs are not "reasonably related . . . to the circumstances which justified the [traffic stop] in the first place," *Sharpe*, 470 U.S. at 682, and are not necessary to "verify . . . the officer's suspicion" of a traffic violation, *Royer*, 460 U.S. at 500.[5] Indeed, for a time, this was the law of several of our sister circuits. *See, e.g.*, *United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001) ("An officer must . . . restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop."); *United States v. Pruitt*, 174 F.3d 1215, 1221 (11th Cir. 1999) ("[A]dditional 'fishing expedition' questions . . . are simply irrelevant, and constitute a violation of *Terry*."). A contrary rule, the Tenth Circuit reasoned, would effectively write *Terry*'s scope prong out of existence. *See United States v. Holt*, 264 F.3d 1215, 1228 & n.3 (10th Cir. 2001) (en banc).

We never joined those circuits in categorically restricting the topic of officers' questions during traffic stops. In fact, in one case, we held that an officer did not violate *Terry* by asking "a few" off-topic questions during a traffic stop, including "whether there was anything illegal inside [the automobile]," in the absence of any reasonable suspicion of illegal activity beyond the traffic violation. *See United States v. Burton*, 334 F.3d 514, 515 (6th Cir. 2003). We took particular note that "the traffic stop took

---

[5]Of course, in most traffic stops – as opposed to most standard *Terry* stops – the officer will be quite certain that a traffic violation occurred at the outset, and will not need to "verify . . . [his] suspicion" at all. The *Sharpe* formulation of the *Terry* scope test thus appears better suited to traffic stops than that in *Royer*.

place . . . [in a known] high-crime area . . . at 11:30 p.m." and that "[t]he record provide[d] no reason to suspect either that these questions were unusually intrusive or that asking them made this traffic stop any more coercive than a typical traffic stop." *Id.* at 518-19.  Other circuits went further, holding that officers could subject motorists to some degree of unrelated questioning during traffic stops as a matter of course. *See, e.g.*, *United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (en banc); *United States v. Purcell*, 236 F.3d 1274, 1280 (11th Cir. 2001); *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993); *see also United States v. Garrido-Santana*, 360 F.3d 565, 574-75 & n.6 (6th Cir. 2004) (recognizing a circuit split but declining to reach the issue).

This circuit split was resolved in *Muehler v. Mena*, 544 U.S. 93 (2005), in which the Supreme Court gave its imprimatur to wide-ranging questioning during a police detention.  There, the police had entered a house to execute a valid search warrant for "deadly weapons and evidence of gang membership." *Id.* at 95-96.  Although the police did not possess reasonable suspicion that anyone in the house was an illegal immigrant, an Immigration and Naturalization Service officer accompanied the police during the search.  The house's occupants were lawfully detained while the police executed the warrant.  While the search was being carried out, the INS officer asked the detained occupants various immigration-related questions.  *Id.* at 96.  A unanimous Court reversed the appellate court's holding that this off-topic questioning violated the Fourth Amendment, focusing on the fact that the questioning did not prolong the detention:

> [The appellate court's] holding, it appears, was premised on the assumption that the officers were required to have independent reasonable suspicion in order to question Mena concerning her immigration status because the questioning constituted a discrete Fourth Amendment event. But the premise is faulty. We have "held repeatedly that mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); *see also INS v. Delgado*, 466 U.S. 210, 212, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984). "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual . . . ." *Bostick*, supra, at 434-435, 111 S. Ct. 2382 (citations omitted). *As the Court of Appeals did not hold that the detention was prolonged by the questioning,* there was no additional seizure within the meaning of the Fourth Amendment. Hence, the officers did not need reasonable

suspicion to ask Mena for her name, date and place of birth, or immigration status. . . . [T]he initial . . . detention was lawful; the Court of Appeals *did not find that the questioning extended the time Mena was detained*. Thus no additional Fourth Amendment justification for inquiring about Mena's immigration status was required.

*Id.* at 100-01 (emphasis added). Although *Muehler* was not a traffic-stop case, its reasoning logically applies to traffic stops, and the federal courts of appeals readily extended its holding to the traffic-stop context. *See, e.g.*, *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007) ("[*Muehler*'s] reasoning is equally applicable in the traffic stop context.").[6]

Most recently, in *Arizona v. Johnson*, 129 S. Ct. 781 (2009), another unanimous opinion, the Court removed all doubt that *Muehler*'s reasoning applies to traffic stops. *Id.* at 788 ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." (citing *Muehler*, 544 U.S. at 100-01)). *Johnson* involved an officer's questions to an automobile's passenger about gang affiliation while a second officer was attending to the driver's license, registration, and insurance information. *Id.* at 784. Thus, as in *Muehler*, the questioning in *Johnson* had no effect on the overall duration of the seizure.

*Muehler* and *Johnson* are not absolutely on all fours with this case, however, as neither party disputes that Ford's initial question about "weapons or narcotics . . . or anything illegal" in theory extended the stop by a few seconds.[7] Moreover, neither of

---

[6] *Muehler*'s rationale that "only such conduct as itself constitutes a [separate] Fourth Amendment search [or seizure] can . . . amount[] to a [*Terry*] scope violation" has been subjected to significant criticism. Wayne R. LaFave, Search and Seizure (4th ed.) § 9.3(b) (arguing that "the Supreme Court's relevant prior decisions consistently point in the other direction"); *see also* Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843, 1887 (2004) (stating that the position which the Court would go on to adopt in *Muehler* is "dead wrong!").

[7] We need be concerned only with the propriety of Ford's initial question. Assuming her initial question was proper, Everett's response to this question – that he "had an open forty-ounce beer and a .410 shotgun, which . . . he knew he was not supposed to have because he was a convicted felon" – gave Ford separate grounds to search and/or arrest him for driving with an open container of alcohol, *see* Tenn. Code Ann. § 55-10-416(a)(1), or for a firearm violation. Thus, the length of time expended through further questioning was irrelevant. On the other hand, if the prolongation caused by her initial question violated the Fourth Amendment, all that followed was suppressible as "fruit of the poisonous tree." *See Wong Sun*

those cases specifically addressed what the outcome would have been if the questioning at issue *had* prolonged the defendants' respective seizures.  Therefore, we must look to the reasoning underlying *Muehler* and *Johnson*, and to the animating principles of the Supreme Court's Fourth Amendment case law as a whole, to determine whether the questioning that occurred here was permissible.

## V

The first decision we must make is whether to construe *Muehler* and *Johnson* as establishing a bright-line "no prolongation" rule, under which *any* extension of a traffic stop due to suspicionless extraneous questioning – no matter how brief – is per se unreasonable.  Such a rule would not be without some textual basis: the *Johnson* Court stated that unrelated questions are permissible "so long as those inquiries do not *measurably* extend the duration of the stop."  129 S. Ct. at 788 (emphasis added).  In this age, when even cheap wristwatches accurately mark off time in milliseconds, there is no doubt that Ford's question took up a quantum of time large enough to be measured.  *See* Reid M. Bolton, Comment, *The Legality of Prolonged Traffic Stops After* Herring*: Brief Delays as Isolated Negligence*, 76 U. Chi. L. Rev. 1781, 1796-97 (2009) (relying on *Johnson*'s "measurably extend" language to argue that "all delays, whether miniscule [sic] or time-consuming," violate the Fourth Amendment).  Everett also argues that a strict "no prolongation" rule is necessary to prevent abuse of the wide discretion to stop errant motorists that police officers already enjoy under *Whren*.  This is a subject of legitimate concern.  *See Hill*, 195 F.3d at 267 (noting that "the potential for police officers to abuse the *Whren* principle is apparent"); *accord United States v. Chhien*, 266 F.3d 1, 9 (1st Cir. 2001).

Nevertheless, the overwhelming weight of authority militates against a bright-line "no prolongation" rule.  First, with respect to the relevant passage from *Johnson*, we note that another definition of the word "measurable" is "significant" or "great enough to be worth consideration."  Webster's Third New International Dictionary Unabridged

---

*v. United States*, 371 U.S. 471, 488 (1963).

(1981) at 1399.**[8]** Only this definition is consistent with *Johnson*'s reliance on *Muehler*, which in turn relied on *Illinois v. Caballes*; in *Caballes*, the Court had held that "a dog sniff performed during a traffic stop does not violate the Fourth Amendment . . . [if the dog sniff does not cause the stop to be] 'prolonged *beyond the time reasonably required* to complete [the] mission [of issuing a warning ticket].'" *Muehler*, 544 U.S. at 101 (quoting *Caballes*, 543 U.S. at 407) (emphasis added).

More broadly, the Supreme Court has repeatedly emphasized, across a variety of contexts, that "[t]he ultimate touchstone of the Fourth Amendment . . . is 'reasonableness.'" *Michigan v. Fisher*, 130 S. Ct. 546, 548 (2009); *see also Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ("We have long held that the touchstone of the Fourth Amendment is reasonableness." (internal quotation marks omitted)). Accordingly, the Court's Fourth Amendment jurisprudence "ha[s] consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." *Ibid.*; *see also Michigan v. Chesternut*, 486 U.S. 567, 572-73 (1988) (rejecting a proposed "bright-line rule" as contrary to the Court's "traditional contextual approach" under the Fourth Amendment).

We also note that each of our sister circuits to confront this question since *Muehler* has refused to adopt a bright-line "no prolongation" rule. *See United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009); *United States v. Derverger*, 337 F. App'x 34, 36 (2d Cir. 2009); *United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008); *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006).

Finally, we find it significant that Everett's proposed no-prolongation rule would provide little actual protection against police abuses. *Muehler* and *Johnson* make clear (and Everett does not dispute) that an officer may ask unrelated questions to his heart's content, provided he does so during the supposedly dead time while he or another officer

---

**[8]**In fact, as the immediate etymological antecedent of the adjective "measurable" and adverb "measurably," Webster's gives the Middle English *mesurable*, meaning "moderate." Webster's Third New International Dictionary Unabridged (1981) at 1399.

is completing a task related to the traffic violation. *See also United States v. Bell*, 555 F.3d 535, 542-43 (6th Cir. 2009) (finding no Fourth Amendment violation where officer asked motorist questions "while writing the warning," since "there [was] no evidence that this discussion extended the time required to write the warning"); *United States v. Soriano-Jarquin*, 492 F.3d 495, 501 (4th Cir. 2007) ("In this case, [the officer's question] did not prolong the stop, as it occurred while [a] police trainee checked the driver's license and registration and prepared his citations."); *Garrido-Santana*, 360 F.3d at 575 ("[I]n asking defendant whether he possessed any illegal contraband, [Officer] Lomax did not [prolong] the traffic stop. At that time, Lomax . . . was still filling out the courtesy citation and . . . was still waiting for the return of the computer check on the vehicle's license plate."). Thus, a police officer intent on asking extraneous questions could easily evade Everett's proposed rule – by delegating the standard traffic-stop routine to a backup officer, leaving himself free to conduct unrelated questioning all the while, or simply by learning to write and ask questions at the same time.

Because the vast weight of authority is against a bright-line rule, and because such a rule would not even serve its intended purpose as a bulwark against pretextual police activity, we join our sister circuits in declining to construe *Muehler* and *Johnson* as imposing a categorical ban on suspicionless unrelated questioning that may minimally prolong a traffic stop.[9]

---

[9]Everett argues that we have effectively already adopted a bright-line "no prolongation" rule in *United States v. Urrieta*, 520 F.3d 569 (6th Cir. 2008). In *Urrieta*, we held that "*[o]nce the purpose of [a] traffic stop is completed*, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *Id.* at 574 (emphasis added). In the portion of *Urrieta* upon which Everett relies, we rejected the government's argument that the continued detention "was justified because [it] was reasonably brief." *Id.* at 578. We reasoned:

> Under the Fourth Amendment, even the briefest of detentions is too long if the police lack a reasonable suspicion of specific criminal activity. In other words, law enforcement does not get a free pass to extend a lawful detention into an unlawful one simply because the unlawful extension was brief.

*Id.* at 578-79 (internal citation omitted). However, *Urrieta*'s analysis was limited to scenarios in which a traffic stop had already come to a logical conclusion at the time of the offending questioning, such that the extension of the stop constituted a new, independent seizure requiring reasonable suspicion. *See id.* at 578 ("[E]ven the briefest *of detentions [without reasonable suspicion]* is too long. . . ." (emphasis added)). Here, by contrast, the questioning at issue occurred well before the purpose of the stop was completed. Thus, in this case, the original detention (and the original probable cause that supported it) was still alive. Accordingly, *Urrieta*'s holding that "even the briefest of detentions" requires at least reasonable suspicion has no application here.

## VI

Of course, this raises a second important question: if *some* prolongation is permissible under *Muehler* and *Johnson*, how much is too much?  Once again, those decisions themselves are silent, and commentators have noted the difficulty in formulating a principled rule.  *See* Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843, 1871 (2004) ("Once the rather clear *Terry* limit, tied to those activities defensible in terms of responding to the traffic infraction, is abandoned, there remains no other basis for making a judgment . . . – unless it is simply a matter of applying the 'horseshoes rule,' i.e., that just being close counts."); Orin S. Kerr, *Officer Questioning in a Traffic Stop*, The Volokh Conspiracy, Oct. 21, 2009, http://volokh.com/2009/10/21/officer-questioning-in-a-traffic-stop/ ("There aren't a lot of easy answers here . . . .").

So far, our sister circuits have given their blessing to prolongations greater than the several seconds at issue here.  *See Chaney*, 584 F.3d at 26 (holding that a "delay of approximately two minutes" for unrelated questioning was "de minimus [sic]" and "did not measurably extend the duration of the stop"); *Derverger*, 337 F. App'x at 36 ("We conclude . . . that the five minutes of [unrelated] questioning did not significantly extend the time Derverger was detained."); *Olivera-Mendez*, 484 F.3d at 511(holding that a twenty-five-second delay to "ask[] three brief [unrelated] questions" did not violate the Fourth Amendment); *Alcaraz-Arellano*, 441 F.3d at 1259 (holding that a delay of less than ninety seconds "did not appreciably lengthen the detention").  Our sister circuits have also found significantly longer delays unlawful.  *See, e.g.*, *United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008) (holding that the Fourth Amendment was violated where, three minutes into a traffic stop, the officer told the driver he would receive a warning ticket, but then spent 13 minutes questioning him primarily about drugs, absent any reasonable suspicion, without issuing a ticket).  Nevertheless, having just refused to set a bright line at *zero*, we cannot very well select *another* arbitrary quantity of time and

proclaim that any prolongation less than that amount is categorically "de minimis" – as convenient as such a rule might be.

Rather, because the touchstone of any Fourth Amendment analysis is reasonableness, we must conduct a fact-bound, context-dependent inquiry in each case. Furthermore, we conclude that it would be inappropriate merely to evaluate the reasonableness of *the interval of prolongation* in isolation. Instead, the proper inquiry is whether the "totality of the circumstances surrounding the stop" indicates that the duration of *the stop as a whole* – including any prolongation due to suspicionless unrelated questioning – was reasonable. *Turvin*, 517 F.3d at 1101; *see also United States v. Patterson*, 472 F.3d 767, 776 (10th Cir. 2006) (stating that courts must "consider the detention as a whole"); *cf. Caballes*, 543 U.S. at 408-09 (stating that a suspicionless canine sniff during a traffic stop violates the Fourth Amendment if it "prolong[s the stop] beyond the time reasonably required to complete [the] mission" of issuing a ticket).

The Supreme Court has provided some abstract guidance, noting that "[i]n assessing whether a [stop] is too long in duration . . . , we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly . . . ." *Sharpe*, 470 U.S. at 686. In other words, the overarching consideration is *the officer's diligence* – i.e., his "persevering" or "devoted . . . application to accomplish [the] undertaking" of ascertaining whether the suspected traffic violation occurred, and, if necessary, issuing a ticket. Webster's Third New International Dictionary Unabridged (1981) at 633. The question of the officer's diligence, as with so much else in the Fourth Amendment context, is "determine[d] . . . under the totality of the circumstances . . . ." *United States v. Fountain*, 2 F.3d 656, 665 (6th Cir. 1993), *overruled in part on other grounds by Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997).

Importantly, in evaluating whether an officer's prolongation of a traffic stop through extraneous questions indicates a lack of diligence, the *subject* of those questions, no less than their quantity, is part of the "totality of the circumstances" of the stop, and

is therefore a relevant consideration. That is to say, some questions are "far[ther] afield" than others. *Chhien*, 266 F.3d at 9.[10] For instance, even our sister circuits that, pre-*Muehler*, took the most restrictive view toward traffic-stop questioning permitted certain locomotion-related inquiries not strictly directed to the motorist's conduct at the time of the stop, such as "[the] motorist's travel history and travel plans" and "the driver's authority to operate the vehicle," because such questions "may help explain, or put into context," why the motorist was committing the suspicious behavior the officer observed. *Holt*, 264 F.3d at 1215. Such context-framing questions will rarely suggest a lack of diligence.

Additionally, the Supreme Court has emphasized that "the safety of the officer" during a traffic stop is a "legitimate and weighty" interest, *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977); accordingly, there has been widespread agreement – both before *Muehler* and since – that officers conducting a traffic stop may inquire about dangerous weapons. *See Chaney*, 584 F.3d at 26; *United States v. May*, No. 98-3113, 1999 WL 1215651, at *3 (D.C. Cir. Nov. 8, 1999); *Holt*, 264 F.3d at 1223.[11] Questions directed toward officer safety, therefore, do not bespeak a lack of diligence.

At other times, however, an officer's questions will be relevant only to ferreting out unrelated criminal conduct. Because the reasonable diligence standard does not "require[ an officer] to move at top speed," *Turvin*, 517 F.3d at 1097, here, too, some amount of questioning is permissible – so long as the officer's overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward

---

[10]*Muehler* and *Johnson* do not establish that the subject of an officer's questioning is irrelevant to the *Terry* analysis altogether. Those cases stand for the proposition that mere questioning – on any subject – cannot violate the *scope* prong of *Terry*. Therefore, where *Terry*'s duration prong is not at issue, as in *Muehler and Johnson*, the subject of the questioning will indeed be irrelevant. *See Alcaraz-Arellano*, 441 F.3d at 1258 ("In light of *Muehler*, . . . [a]s long as the [deputy's] questioning did not extend the length of the detention, . . . there is no Fourth Amendment issue with respect to the content of the questions." (internal quotation marks omitted) (emphasis added) (alterations in original)). On the other hand, where the duration prong *is* relevant, as it is here, nothing in either *Muehler* or *Johnson* suggests that the subject of the questions should not be taken into account as one factor in the diligence analysis.

[11]Indeed, since the Court held in *Mimms* that safety considerations justify officers ordering motorists out of their vehicles during traffic stops as a matter of course, it would be irrational to conclude that officers cannot take the "less intrusive [measure]" of "simply [asking] whether a driver has a gun." *May*, 1999 WL 1215651, at *3; *see also Holt*, 264 F.3d at 1223.

the proper ends of the stop. By contrast, if the totality of the circumstances, viewed objectively, establishes that the officer, without reasonable suspicion, definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation, this would surely bespeak a lack of diligence. So, too, if the circumstances establish that, over the course of the entire stop, "questions unrelated to the traffic violation constituted the bulk of the interaction between the trooper and the [motorist]." *Peralez*, 526 F.3d at 1115.[12]

Judged by this standard, this case is not remotely close. First of all, Ford's question specifically raised the subject of "weapons," which is reasonably related to the "legitimate and weighty" consideration of officer safety. *Mimms*, 434 U.S. at 110. While safety considerations are always relevant, they have even greater salience here, as Ford had grounds to suspect that Everett was intoxicated. *See Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007) (noting that "[d]runk persons are generally unpredictable," such that extra police precautions may be justified in confronting an intoxicated suspect).

And, while Ford also mentioned "narcotics" and other "illegal" items – which are less directly related to officer safety – the additional delay caused by the insertion of several extra words, under the totality of the circumstances, does not signify a lack of diligence. We emphasize that Ford asked only a single question before Everett confessed to possessing an illegal gun and an open container of alcohol, giving her probable cause to arrest him and search the car. It cannot be said that this single question, in the situation Ford confronted, constituted a *definitive* abandonment of the prosecution of the traffic stop in favor of a *sustained* investigation into drug or firearm offenses.[13] Nor did this single question, taking up several seconds, constitute the bulk

---

[12]Importantly, it is the objective conduct of the officer which the diligence standard measures; his subjective intent or hope to uncover unrelated criminal conduct is irrelevant. *See Whren*, 517 U.S. at 813.

[13]As it happens, the question did, in fact, *result* in a sustained investigation into other offenses, once Everett immediately confessed to possessing contraband, giving rise to probable cause. Ford, however, cannot be faulted for this fortuitous outcome.

of the interaction between Ford and Everett.**14**  Accordingly, Ford's questioning did not render the traffic stop an unreasonable seizure under the Fourth Amendment.

## VII

In concluding, we caution that the rule of *Muehler* and *Johnson* – i.e., that extraneous questions are a Fourth Amendment nullity in the absence of prolongation – is premised upon the assumption that the motorist's responses are voluntary and not coerced.  For its proposition that "mere police questioning" does not trigger the Fourth Amendment, *Muehler* quoted and relied on *Florida v. Bostick*, 501 U.S. 429 (1991), in which the Court stated:

> Since *Terry*, we have held repeatedly that mere police questioning does not constitute a seizure. In *Florida v. Royer*, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (plurality opinion), for example, we explained that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, *by asking him if he is willing* to answer some questions, by putting questions to him *if the person is willing* to listen, or by offering in evidence in a criminal prosecution his *voluntary* answers to such questions."
>
> * * *
>
> We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual . . . – *as long as the police do not convey a message that compliance with their requests is required.*

*Bostick*, 501 U.S. at 434-35 (some internal citations omitted) (emphases added).

The Court that decided *Muehler* and *Johnson* clearly believed that questioning during a traffic stop is not *ipso facto* coercive under *Royer* and *Bostick*.  *But see Berkemer v. McCarty*, 468 U.S. 420, 438 (1984) (recognizing that "the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure

---

**14**Of course, where, as here, the allegedly offending questioning occurs at the beginning of a traffic stop and immediately results in an incriminating statement, the portion of the total interaction taken up by the questioning is less meaningful.

on the detainee to respond to questions"). However, there is nothing in *Muehler* or *Johnson* that overrules the Court's earlier statements that *sufficiently* coercive suspicionless questioning triggers the Fourth Amendment. Accordingly, as we construe *Muehler* and *Johnson*, sufficiently coercive unrelated questioning during a traffic stop, in the absence of separate reasonable suspicion, violates the Fourth Amendment – prolongation or no. *See Burton*, 334 F.3d at 518-19 (pre-*Muehler*, upholding brief unrelated questioning where, inter alia, "[t]he record provide[d] no reason to suspect . . . that asking [the questions] made this traffic stop any more coercive than a typical traffic stop"); *cf. United States v. Walton*, 258 F. App'x 753, 759 (6th Cir. 2007) (Boggs, J., dissenting) (stating that, where officer "falsely inform[ed] the [driver] that his detention [would] be indefinitely prolonged," driver's subsequent consent to automobile search was not voluntarily given).

As there were no allegations of especially heavy-handed police conduct in this case, however, we leave for another day the question of when suspicionless extraneous questioning during a traffic stop crosses the line from consensual into coercive.

## VIII

For the reasons described above, we **AFFIRM** the district court's denial of Everett's suppression motion.