GREGORY, Circuit Judge,
dissenting:
In my view, Trooper Blake Swicord violated Victor Mason’s Fourth Amendment rights by extending the length and scope of Mason’s detention beyond that which was necessary for a routine traffic violation, without reasonable suspicion to believe that any further illegal activity was afoot. Therefore, I respectfully dissent.[1]
I.
Regrettably, I must begin by supplementing and clarifying some key facts about Trooper Swicord’s detention of Mason that are omitted by the majority.[2]
At approximately 11:40 AM, Trooper Swicord signaled for Mason to pull over based on his suspicion that the tint on Mason’s windows was too dark, in violation of Georgia law. According to Swicord, Mason did not begin to pull over during these one-to-two seconds, which immediately aroused his suspicion. Though it is clear from the video of the stop that Mason was in the process of pulling over as soon as the tape began, Swicord testified that there was a one-to-two second delay between the time he activated his blue light and the time the dashboard camera began recording. During this time, Swicord also noticed that Mason had turned to his passenger, Govan, which the officer also deemed suspicious. When Swicord approached the car and began talking to Mason, he noticed a strong smell of air freshener, noticed that the key in the ignition was on a keychain with no other keys, and that there was no luggage in the backseat.
At the suppression hearing, Trooper Swicord testified on cross-examination that based on his “experience,” he was suspicious that criminal activity was afoot as soon as he pulled over Mason’s car. J.A. 95. He agreed with defense counsel’s as *135 sertion that his suspicion was based on “sort of gut instinct.” Id.
After an initial discussion with Mason about why he was pulled over, Trooper Swicord ordered Mason out of the vehicle. Standing by the side of the highway, Swicord proceeded to ask Mason a series of questions about where Mason was coming from, where he was going, and the purpose of his travel. During this time, the officer testified that Mason was
[n]ot making eye contact, shifting his weight. It’s hard to explain in the sense that if you’ve ever looked into the eyes of a person that’s looking at the rest of their life in prison they have a certain look about them. And fear is hard to explain in that sense. But when you are looking at a person that is fearful it’s just a different look that every officer that I know understands.
J.A. 99. Trooper Swicord’s testimony that Mason was “not making eye contact” is contradicted by video of the stop, which shows Mason looking at the officer throughout the questioning, while the officer looks away.
After completing his questioning of Mason, Trooper Swicord then repeated the same questions to Govan. This encounter lasted a bit more than one minute. When Govan gave a conflicting account of the purpose of the trip, the officer returned to his patrol car and radioed for a K-9 unit to come to the scene. He told the dispatcher, ‘When you get through with that [inaudible], come on over to me right here, I got something right here, these guys are spooky spooky.'”
On direct examination, the attorney for the government asked Trooper Swicord why he called for K-9 backup. He replied, somewhat bizarrely:
I have been in a lot of violent confrontations coming out of Atlanta. Mr. Mason and Mr. Govan are older black males that are not in good shape, I didn’t feel like they would challenge me physically. I felt like if they had a gun we were probably fixing to shoot it out.
J.A. 89. When then asked whether this was based on his observations of Mason and Govan, the officer responded, “that’s based on experience.” Id.
Once he requested backup, Trooper Swicord then returned to Mason’s vehicle to test the window tint. After doing so, he went back to his patrol car and again radioed dispatch. This time, he asked the dispatcher to check whether there were any outstanding warrants for Mason or Govan’s arrest. Curiously, the officer told the dispatcher to hold the information, rather than run the check immediately.
WTien the K-9 unit arrived, Trooper Swicord testified that the drug-sniffing dog alerted to the presence of drugs in Mason’s trunk. The officer then searched the trunk and found 10 kilograms of cocaine. Mason and Govan were then arrested. The detention, as measured between the time Trooper Swicord stopped Mason’s car and the time he arrested Mason and Go-van, lasted 18 minutes.
Prior to trial, Mason moved to suppress the drugs found in his car on the grounds that Trooper Swicord lacked reasonable suspicion to extend the stop beyond that which was necessary to cite him for a window-tint violation and on the grounds that he lacked probable cause to search the trunk. The district court denied Mason’s motion on both grounds. Mason then proceeded to trial where he was convicted of possession with intent to distribute five kilograms or more of cocaine and subsequently sentenced to life imprisonment.
II.
In light of these facts, there can be no doubt that Trooper Swicord extended Ma *136 son’s detention beyond what was necessary to issue him a warning for a window-tint violation. When Swicord ordered Mason out of the car and questioned him about matters wholly unrelated to the window tint and then repeated the same questioning to Govan, the prolonged detention was not justified by probable cause to believe that the motorists had committed a traffic infraction.
Therefore, in order for the detention to comply with the Fourth Amendment, Swicord either had to have reasonable suspicion to believe that criminal activity was afoot when he prolonged his investigation, United States v. Branch, 537 F.3d 328, 336 (4th Cir.2008), or his questioning must not have “measurably extended] the duration of the stop,” Arizona v. Johnson, — U.S. -, 129 S.Ct. 781, 788, 172 L.Ed.2d 694 (2009). Because Swicord lacked reasonable suspicion that criminal activity was afoot when he extended the stop, and because that extension was “measurable]” when viewed under the totality of the circumstances, Swicord violated Mason’s Fourth Amendment rights.
A.
When conducting a routine traffic stop, a police officer may not detain the driver or passenger beyond the point necessary to effect that stop without reasonable suspicion to believe that either is engaged in additional criminal activity. Branch, 537 F.3d at 336; see Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (“[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.”). Reasonable suspicion, though incapable of a precise definition, must consist of “specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant” further governmental intrusion upon an individual’s liberty. Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). These specific, articulable facts will not support reasonable suspicion, however, if they “describe a very large category of presumably innocent travelers.” Reid v. Georgia, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). Nor can an officer’s suspicion be based on merely “ ‘inchoate and unparticularized suspicion or hunch.’ ” Branch, 537 F.3d at 336 (quoting Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).
After reviewing Trooper Swicord’s testimony and video of the stop, it is abundantly clear that he lacked reasonable suspicion at the point he ordered Mason out of the car and that he lacked the requisite suspicion until, at very least, he completed his conversation with Govan.[3] Swicord repeatedly stated in his testimony that he believed Mason possessed drugs based on his “experience” and that he knew as soon as he pulled Mason over that he was transporting drugs simply based on “gut instinct.” He stated that he knew Mason was carrying drugs just by “looking] into [his] eyes,” even though he could not provide any objective facts to justify this suspicion. On the video, Swicord gave no reason for requesting drug-sniffing dogs beyond stating that “these guys are spooky spooky.” When asked by the government why he called for K-9 backup, Swicord gave a soliloquy about the propensity for violence of “older black males that are not in good shape” coming from Atlanta. And only after twice being asked by the government whether this was based on *137 his actual observations of Mason and Go-van did he say that it was, in addition to his “experience.” In short, Trooper Swicord was playing a “hunch” based on no more than “inchoate and unparticularized suspicion” when he extended the stop by questioning Mason and Govan about matters unrelated to the window-tint violation. Branch, 537 F.3d at 336 (quoting Ward-low, 528 U.S. at 124,120 S.Ct. 673).
Likewise, those objective factors listed by the government are classically impermissible, post-hoc rationalizations that cannot justify reasonable suspicion because they fail to exclude “a very large category of presumably innocent travelers.” Reid, 448 U.S. at 441, 100 S.Ct. 2752. Swicord testified that prior to his questioning Mason and Govan he was suspicious because of (1) Mason’s one-to-two second delay in pulling over; (2) Mason’s looking in the direction of his passenger; (3) the fact that there was a strong smell of air freshener in the car; (4) the fact that Mason was driving away from Atlanta; (5) the fact that there was only one key in the ignition; and (6) the fact that there was no visible luggage in the backseat. Yet Swicord failed to articulate why any of these factors would be associated with criminal activity. In other words, Swicord provided “articulable” facts, yet provided no basis for why these factors were “suspicious” individually or in the aggregate. Cf. Terry, 392 U.S. at 21, 88 S.Ct. 1868.
Regarding the one key in the ignition, for example, Trooper Swicord stated that it suggested to him that the car was borrowed.[4] Because it was borrowed, he stated, there was no house key. “And the reason there’s no house keys,” he stated, “is because there’s criminal activity being pursued and no one wants to be linked to the car or criminal activity.” J.A. 84. Swicord gave no further basis, either in logic or his professional experience, for the supposed link between lack of house keys and criminal activity.
Likewise, Trooper Swicord stated that as he approached the vehicle he noticed that there was no luggage in the backseat, which he testified immediately made him suspicious that Mason was on a turnaround trip from Atlanta to buy and sell drugs.[5] Yet there was no reason why Mason and Govan could not have placed their luggage in the car’s trunk.
More problematically, though, this statement is quite obviously post-hoc and not based on Swicord’s real-time observations. At the time he approached the car, Swicord had no idea of where Mason and Govan were coming from or any reason to suspect that their travels reasonably required luggage — he only learned about the nature of their trip after questioning them separately. Far from providing reasonable suspicion at the time of the questioning, then, the factors listed by Swicord can only be reasonably viewed as attempts to justify his unsupported, “gut instinct” after-the-fact. “[A]n objective assessment of an officer’s actions in light of the facts and circumstances then known to him,” simply cannot support Swicord and the government’s insistence, after-the-fact, that he had a reasonable basis for suspicion as soon as he stopped Mason. See United States v. Rooks, 596 F.3d 204, 210 (4th Cir.2010) (quoting Scott v. United States, 436 U.S. 128, 137, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)).
*138 It is true, of course, that our review of Trooper Swicord’s suspicion must be “holistic,” Branch, 537 F.3d at 337, and that in certain circumstances “wholly lawful conduct might justify the suspicion that criminal activity was afoot,” Reid, 448 U.S. at 441, 100 S.Ct. 2752.[6] Not so here. Even when viewed holistically, the facts listed at varying times by Trooper Swicord and argued by the government simply do not exclude enough innocent travelers to justify reasonable suspicion. See id. At oral argument, the government conceded that every factor that it used to justify reasonable suspicion could apply to either every car on 1-20 or at least millions of them. If police officers could justify a full investigative detention of every ear that took one second to pull over, in which the driver looked in the passenger’s direction, had air freshener, had no luggage, and was driving away from Atlanta (and presumably to or away from any “source” city in the country), then courts would in essence constitutionally bless “virtually random seizures” on every highway on the east coast. See id. Searches and seizures based on so “slender a reed” cannot possibly be reasonable in any meaningful sense. See id. Consequently, Trooper Swicord did not have reasonable suspicion to extend the stop when he ordered Mason out of the car.[7]
B.
The majority does not argue that Trooper Swicord had reasonable suspicion to extend the stop to include unrelated questioning of Mason and Govan at the time Swicord ordered Mason out of the car. Instead, the majority argues that Swicord did not “measurably extend the duration of the stop,” Johnson, 129 S.Ct. at 788, because the delay was de minimis, or as he calls it, “only a slight delay.” In other words, the majority interprets the prohibition against “measurably” extending a traffic stop to allow, as a bright-line rule, any extension of at least three-and-a-half minutes.[8] Under well-established Fourth Amendment jurisprudence, this is incorrect.
“ ‘The touchstone of the Fourth Amendment is reasonableness.’ ” Ohio v. Robi *139 nette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (quoting Florida v. Jimeno, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). In conducting the reasonableness analysis, we are instructed to look at the “totality of the circumstances” and “eschew [ ] bright-line rules” in favor of a “fact-specific” analysis. Id. Therefore, in analyzing whether an officer impermissibly extended the duration of a traffic stop without reasonable suspicion, “we must conduct a fact-bound, context-dependent inquiry in each case” that looks to whether the prolonged period was reasonable in light of the stop as a whole. United States v. Everett, 601 F.3d 484, 493 (6th Cir.2010).
In Everett, a case upon which both the government and the majority rely, the Sixth Circuit rejected the argument that any prolongation period could be deemed categorically de minimis. Id. Instead, in a thoughtful and extensively reasoned opinion by Judge Boggs, the court focused its inquiry on whether the challenged delay bespoke a lack of diligence on the part of the investigating officer in making the traffic stop. Id. at 494. Specifically, the court articulated a set of factors to consider, including: (1) the nature of any extraneous questions asked by the investigating officer; (2) whether or not the additional intrusion was conducted out of concern for officer safety; and (3) whether the “ ‘questions unrelated to the traffic violation constituted the bulk of the interaction between the trooper and the motorist’ ” or whether the officer could be deemed to have “definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation.” Id. at 495 (quoting United States v. Peralez, 526 F.3d 1115, 1121 (8th Cir.2008)).
Here, the extraneous questioning was extensive in scope. Trooper Swieord, after ordering Mason out of his vehicle, proceeded to ask him roughly a dozen questions about the nature and purpose of his travel, wholly unrelated to his windows’ tint. Swieord repeated several of the questions through out the exchange, trying to induce Mason into contradicting himself in order to gain reasonable suspicion to further extend the stop.[9] Swieord then similarly engaged Govan, asking him where he stayed, whom he was visiting, and even what time he woke up in the morning. The only possible justification for the repeated and extensive questions to both passengers was to create conflicts in their stories so that Swieord could justify continuing the stop and expanding his investigation. Swieord even admitted as much when he stated that he asked “clarifying questions” of Mason and Govan because subjectively, he “was 100 percent sure they were drug trafficking.” J.A. 108. Though it may be true that isolated questions about a suspect’s itinerary may be permissible to allow the officer to get a better sense of the circumstances he confronts, Everett, 601 F.3d at 494, Swicord’s questions to Mason and Govan were a fishing expedition, designed solely to investigate possible criminal activity.
Likewise, none of Trooper Swicord’s questioning was at all related to officer safety. He neither asked Mason or Govan whether they were carrying weapons, nor did he ever pat them down while speaking with them. Indeed, he even let Govan stay in the car while he spoke with Mason, demonstrating that he was not afraid that there were weapons in the car with which either suspect could harm him or other officers.[10]
*140 Finally, the unrelated questioning was so extensive as to demonstrate that Trooper Swicord’s primary purpose in effecting the stop was not to write a warning for a window-tint violation but instead to investigate other criminal activity. Eleven minutes elapsed between the time Swicord signaled for Mason to pull over and the time he wrote him a warning for the traffic violation. But of those eleven minutes, video of the stop reveals that Trooper Swicord spent no more than two minutes actually investigating and writing a warning for the window-tint violation. Indeed, that amount of time is significantly less if one considers only the period of time between Swicord’s signaling for Mason to pull over and the point at which he finished questioning Govan; the point at which the majority agrees (and I assume for purposes of argument) that Swicord had reasonable suspicion to extend the stop. Swicord, therefore, spent “the bulk of the interaction” with the motorists investigating a crime for which he had no reasonable suspicion, demonstrating a clear lack of diligence in resolving the traffic violation. Id. at 495.[11]
Under the totality of the circumstances, then, Swicord violated Mason’s Fourth Amendment rights by unreasonably delaying Mason’s detention to question him about unrelated matters. Thus, the district court erred in denying Mason’s motion to suppress the drugs found as the result of the unreasonable delay. Mason’s conviction should therefore be reversed.
III.
Victor Mason was denied justice when a police officer targeted him for extended detention based on a hunch and Ms gut instinct regarding people travelling on I-20. That the officers ultimately seized several kilograms of cocaine neither vindicates violating the Fourth Amendment nor lessens our duty to adjudicate justly the rights enshrined therein.

. Because I would hold that Trooper Swicord violated Mason's Fourth Amendment rights by unreasonably delaying his detention, and that any evidence seized as a result of the delay should have been excluded at his trial, I do not consider whether Swicord had probable cause to search Mason’s trunk at the stop’s conclusion. But to the extent reasons given by Swicord were constitutionally insufficient or inappropriate to justify reasonable suspicion to extend Mason's stop, they would likewise not justify probable cause to search Mason’s car.

. These facts are gathered from both Trooper Swicord’s testimony at the suppression hearing and the video of the stop taken by his dashboard camera, which was submitted by the parties as part of the Joint Appendix.

. At that point, as the majority’s opinion in Part II notes, Trooper Swicord had conflicting statements from Mason and Govan about the nature and purpose of their trip.

. Mason had indeed borrowed the car from his daughter, a fact Trooper Swicord confirmed during the stop.

. I leave it to others to surmise how Trooper Swicord could determine whether or not there was luggage in the backseat of Mason's car as he approached the overly tinted windows.

. The facts in Reid are remarkably similar to those here. In Reid, an agent for the Drug Enforcement Administration stopped two passengers in an Atlanta airport who had arrived on an early morning flight from Fort Lauder-dale. 448 U.S. at 439, 100 S.Ct. 2752. The agent was suspicious because the two men had stayed in Fort Lauderdale for only one night, appeared nervous, were looking at each other strangely as they got off the plane, were carrying shoulder bags, and arrived at a time when they could reasonably believe there would not be law enforcement present. Id. The Supreme Court held that these factors did not support a finding of reasonable suspicion. Id. at 441, 100 S.Ct. 2752.

. The following example illustrates the absurdity in finding reasonable suspicion based on the factors listed by the government:
While running errands with her child, a mother is pulled over on 1-20, just north of the Savannah River. It takes her one second to pull over to the right-side emergency lane and while doing so, she looks to the right, which also happens to be where her child is sitting. She has cherry-flavored air freshener hanging from her rearview mirror. She has one key in the ignition because her key, like many keys on modem vehicles that also electronically lock and unlock car doors, is too big to fit on standard-issue key chains. And she has no luggage in the backseat because, like most people travelling to the grocery store, she does not plan to spend the night.
A police officer’s decision to then detain the woman and her child to investigate them for drug trafficking would be patently unreasonable. And the reasonable suspicion analysis does not change with the gender, race, or ethnicity of the motorists.

. The majority’s repeated insistence that the delay was only “one-to-two minutes” is simply inaccurate.

. At no point during the exchange did Mason, in fact, contradict himself.

. Given Trooper Swicord's clear lack of concern for his safety when talking to Mason and Govan, his subsequent testimony that he re *140 quested K-9 backup because he feared the motorists were armed and violent, being as they were older black men leaving Atlanta, J.A. 89, is all the more bizarre.

. Perhaps no single fact demonstrates Trooper Swicord's lack of diligence more than his request that the dispatcher hold any information regarding outstanding warrants for Mason and Govan until he had further opportunity to investigate their behavior.