PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

VICTOR EUGENE MASON,

*Defendant-Appellant.*

No. 07-4900

Appeal from the United States District Court for
the District of South Carolina, at Columbia.
Cameron McGowan Currie, District Judge.
(3:06-cr-00607-CMC)

Argued: May 13, 2010

Decided: December 8, 2010

Before NIEMEYER, GREGORY, and SHEDD,
Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the
majority opinion, in which Judge Shedd joined. Judge Greg-
ory wrote a dissenting opinion.

**OPINION**

**ARGUED**: Jeffrey Michael Brandt, ROBINSON & BRANDT, PSC, Covington, Kentucky, for Appellant. Jeffrey Mikell Johnson, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF**: W. Walter Wilkins, United States Attorney, J. D. Rowell, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

After completing a traffic stop of Victor Mason on Interstate 20, between Atlanta and South Carolina, with the issuance of a warning ticket, the Georgia state trooper making the stop extended it for several minutes, based on the trooper's suspicion of criminal activity, to allow a drug-detection dog to sniff Mason's vehicle. The dog alerted multiple times to the presence of a narcotics odor and then jumped into the car through an open window and sat on the back seat of Mason's vehicle, again alerting to the presence of a narcotics odor. A search of the vehicle thereafter uncovered approximately 10 kilograms of cocaine, for which Mason was convicted of conspiracy to violate 21 U.S.C. § 841(a) and sentenced to a mandatory term of life imprisonment, under 21 U.S.C. § 841(b)(1)(A).

Mason's appeal challenges the constitutionality of the search on the ground that the trooper impermissibly extended the traffic stop to obtain probable cause to search the vehicle, as well as the enhancement of his sentence by reliance on two allegedly invalid previous drug-trafficking convictions. For the reasons that follow, we affirm.

I

At approximately 11:40 a.m. on August 12, 2005, Georgia State Patrol Trooper Blake Swicord observed Mason driving eastbound on Interstate 20 in Morgan County, Georgia, in a vehicle that had, in Trooper Swicord's opinion, excessively tinted windows. Swicord activated his patrol car's blue lights to pull Mason over, which automatically activated audio and video recording equipment, capturing the traffic stop on tape.

Trooper Swicord testified that after he turned on his blue lights, it took Mason "a while to pull over," which "was not normal," and that he observed Mason having a conversation with his passenger, which "raised [his] suspicion." After Mason pulled over and lowered his window, Trooper Swicord noticed, as he approached the vehicle, that Mason was nervous and sweating. He also immediately smelled an "extreme odor" of air freshener coming from the vehicle. Officer Swicord testified at the suppression hearing that the odor was "absolutely abnormal" and strong enough to give an occupant of the car a headache. Swicord also observed that there was only one key on the key ring and that there was no luggage in the interior of the vehicle. He saw on the back seat the newspaper for that day (recognizing Tiger Woods' picture) with a label on it that said "Radisson Hotel." Swicord testified that these factors led him to believe that Mason and his passenger, Nathaniel Govan, were on a "turn-around" trip to Atlanta, a known source city for drugs. Swicord also testified that Interstate 20 was common route for drug traffickers.

After Mason provided his driver's license and the vehicle's registration, Trooper Swicord asked him to step out of the vehicle. When he asked Mason who owned the car, Mason replied that his daughter did. Swicord then asked Mason his daughter's name and the name of his passenger, as well as the purpose for their journey. Mason told Swicord that he had driven to Atlanta to see his uncle about getting a deed. Swicord then walked to the passenger-side window and asked

Govan, who had remained in the vehicle, the reason for their trip. Govan told a different story, stating that they had driven to see a friend, giving two different names. Swicord's questioning of Mason lasted just over two minutes (11:41:20 a.m. to 11:43:34 a.m.) and his questioning of Govan lasted just over one minute (11:43:40 a.m. to 11:44:50 a.m.). Because the two stories conflicted and the newspaper indicated that Mason and Govan had stayed in a motel, Trooper Swicord concluded that both were "lying about their itinerary and were involved in criminal activity."

Trooper Swicord returned to his patrol car, where he radioed Sergeant Michael Kitchens, a member of the K-9 unit, requesting that Kitchens come to the scene with a drug-detection dog. He then exited to test the tint of the windows of Mason's vehicle and determined that they were in fact illegally tinted. Swicord returned to the patrol car to write a warning ticket regarding the illegal tint and to relay to his dispatcher Mason's and Govan's names, as well as insurance and registration information. This practice was routinely followed as a part of a traffic stop to verify information about the vehicle and to check for any outstanding warrants.

Swicord again exited his patrol car and handed the warning ticket to Mason regarding the illegal tint. This occurred at 11:50:45 a.m., less than 11 minutes after Swicord first activated his blue lights. At this point, Swicord had finished all the steps necessary to complete the traffic stop.

Trooper Swicord then asked Mason for consent to search his vehicle, and Mason refused. Swicord informed Mason that he believed that there were drugs in the car and that he was going to have a dog sniff the car to determine whether drugs were inside. Swicord ordered Govan out of the car, by which point in time Sergeant Kitchens had arrived. Sergeant Kitchens took his drug-detection dog on a leash around the outside of Mason's vehicle, and on the first lap around the vehicle (at 11:55:02 a.m.), the dog alerted at both the passenger-side and

driver-side doors. On a second lap around the vehicle, the dog jumped into the vehicle through the open driver-side window and gave a positive indication of the presence of drugs by pointing her nose next to the speaker in the back seat and sitting down on the seat.

After Sergeant Kitchens coaxed the dog out of the car, Trooper Swicord searched the vehicle. In the trunk, he found approximately 10 kilograms of cocaine powder in a black gym bag.

Following Mason's indictment for conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1),* Mason filed a motion to suppress the evidence found in the vehicle, contending that his Fourth Amendment rights were violated because (1) Trooper Swicord lacked reasonable suspicion to detain him beyond completion of the traffic stop and (2) the dog's entry into his vehicle was not supported by probable cause.

The district court denied Mason's motion to suppress after a suppression hearing, at which Trooper Swicord and Sergeant Kitchens testified. The court found that Swicord had reasonable suspicion of drug activity when he had finished processing the warning ticket for the tint violation, justifying his extending the traffic stop. The court also found that the dog alerted to drugs on the outside of the car before jumping into the vehicle on its own, without any command from the officers. The court ruled that the dog's positive indication by entry into the car provided probable cause to justify the search. The court also ruled that when an officer handling a dog does not prompt the dog's entrance into the vehicle, the dog's entrance in response to the "plain smell" of narcotics does not violate the Fourth Amendment.

---

*While Mason was stopped in Georgia, the indictment charged a conspiracy "in the District of South Carolina and elsewhere."

Following Mason's conviction by a jury, the district court sentenced him to a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A), based on the verdict finding him guilty of trafficking in five kilograms or more of cocaine and on his prior felony drug convictions. To satisfy the statutory requirement of at least two prior convictions, the government relied on (1) a conviction in the U.S. District Court for the District of South Carolina on January 25, 1993, for possession of cocaine base with intent to distribute it; (2) a conviction in a Richland County, South Carolina court on February 9, 1988, for possession of cocaine with intent to distribute it; and (3) a conviction in an Orangeburg, South Carolina court on July 22, 1988, for possession of cocaine with intent to distribute it. Mason objected to the use of the two prior state convictions, contending that he did not have an attorney when he pleaded guilty to those charges, and he submitted documents purportedly demonstrating his lack of representation. At the sentencing hearing, the district court found that the documentation did not demonstrate that Mason's prior convictions were uncounseled. Rather, the court found that the evidence indicated beyond a reasonable doubt that on both occasions Mason had the assistance of counsel. Accordingly, the court imposed the mandatory life sentence under § 841(b)(1)(A).

From the court's judgment, Mason filed this appeal, challenging the denial of his suppression motion and the enhancement of his sentence.

II

Mason contends principally that the district court erred in denying his motion to suppress. He argues (1) that "the police lacked reasonable articulable suspicion to detain him beyond the time necessary to issue him a warning for his window tint," and (2) that even if his continued detention was lawful due to reasonable suspicion, his Fourth Amendment rights were violated when the dog entered the car, either because

Sergeant Kitchens opened the door to let the dog in or because probable cause to justify the entry was lacking.

With respect to Mason's contention that reasonable suspicion was lacking to detain him after he was issued a warning ticket for the illegal tint, the government acknowledges that the traffic stop was completed when Trooper Swicord issued the warning ticket, at approximately 11:51 a.m., having taken some 11 minutes after Mason was pulled over. Mason's continued detention therefore required Trooper Swicord to have had a reasonable suspicion of criminal activity. *See Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality opinion); *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004).

Since *Terry v. Ohio*, 392 U.S. 1 (1968), a "reasonable suspicion" of criminal activity has justified an officer's brief stop or detention of the suspect sufficient to permit the officer to allay the suspicion. "Reasonable suspicion" is demonstrated when an officer "point[s] to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (internal quotation marks and citations omitted). We have recognized that this standard "is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life." *Foreman*, 369 F.3d at 781. For that reason, in assessing reasonable suspicion, courts must "consider the totality of the circumstances" and "give due weight to common sense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see also Branch*, 537 F.3d at 336-37 (noting that courts may "credit the practical experience of officers who observe on a daily basis what transpires on the street" (internal quotation marks and citation omitted)).

In this case, we readily conclude that when Trooper Swicord completed the traffic stop, his suspicion that Mason and

Govan were engaged in criminal activity was indeed reasonable, thereby justifying their additional detention. He articulated facts, when taken as a whole, supported his suspicion, even though several of the facts, when taken alone, were also consistent with innocent travel. *First*, Trooper Swicord stated that when he turned on his blue lights to pull Mason over, Mason did not pull over promptly, delaying his move in an abnormal manner, and that Mason at the same time engaged in a conversation with the passenger. Even though a conversation between the driver and his passenger could have been expected, Swicord suspected that because the conversation was combined with the abnormal delay, Mason and Govan could have been deliberating on whether to comply with the blue lights or to flee. *Second*, when Swicord approached the vehicle and Mason rolled down the window, Swicord was immediately struck by an "extreme" odor of air fresheners beyond what he had normally experienced from the ordinary use of such fresheners. *See Branch*, 537 F.3d at 338 (noting that the "presence of several air fresheners—'commonly used to mask the smell of narcotics'"—is one factor contributing to reasonable suspicion (quoting *Foreman*, 369 F.3d at 785)). *Third*, Swicord observed that there was only a single key on Mason's key ring. He concluded that this fact, combined with the fact that the two men were coming from the direction of Atlanta, a city that, according to him, was ranked third in the nation in terms of drug distribution, on a known drug route, could indicate that the men might have been on a "turn-around" trip as drug couriers. *See Foreman*, 369 F.3d at 785 (noting that the fact that the driver was coming from a known "source city" is a relevant factor supporting reasonable suspicion, particularly when other factors indicate that the stay in the source city had been brief). *Fourth*, Swicord noted that Mason was sweating and unusually nervous when interacting with him, and Mason's nervousness did not subside, as occurs normally, but became more pronounced as the stop continued. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in deter-

mining reasonable suspicion"). *Fifth*, and finally, when Mason and Govan were asked separately about the purpose of their travel, the two men gave conflicting answers, indicating that they were covering up the place where they had stayed and the real purpose of their travel. In addition, a current newspaper on the back seat indicated to Swicord that Mason and Gorman had actually stayed at a motel, further contradicting their stories.

We recognize that several of these facts could hardly have distinguished suspicious activity from innocent travel. But when all the articulated facts are taken as a whole, especially when they include the fact of Mason and Govan's conflicting stories about the place where they stayed and the purpose of their travel, sufficient facts existed to have given an experienced officer a reasonable suspicion that criminal activity was afoot.

Mason's argument focuses on the factors individually, claiming that each was subject to an innocent explanation and therefore could not have served to justify his continued detention. He explains, for instance, that he had only a single key because he had borrowed the car from his daughter and that he was sweating because it was a hot day. But just as one corner of a picture might not reveal the picture's subject or nature, each component that contributes to reasonable suspicion might not alone give rise to reasonable suspicion. Indeed, it is often noted that the existence of reasonable suspicion is a case-specific inquiry, based on the totality of the circumstances. Thus, each factor contributing to a reasonable suspicion might be "consistent with innocent travel" but "when taken together, [might] give rise to reasonable suspicion." *Foreman*, 369 F.3d at 781 (emphasis omitted) (citing *United States v. Sokolow*, 490 U.S. 1, 9 (1989)); *see also Branch*, 537 F.3d at 336 ("[C]ontext matters: actions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances"). Such is precisely the case here, with all of the

factors coming together at a single place and point in time to create a suspicion that each individual factor might not have created.

At bottom, we conclude that the objective facts facing Trooper Swicord created a reasonable suspicion of criminal activity and that he was therefore justified, under *Terry* and its progeny, in extending the stop for the brief period necessary to allay that suspicion.

Mason argues additionally that suspicion is not probable cause and therefore that Sergeant Kitchens' dog was not constitutionally justified in "enter[ing] the [vehicle] before alerting to the presence of drugs [when] no warrant or exception to the warrant requirement existed." He also disputes the district court's factual finding that the dog entered the vehicle of its own accord. Instead, Mason maintains that the dog's handler, Sergeant Kitchens, facilitated the dog's entry by slightly opening the door or by holding the dog on a loose leash, "allow[ing] the [dog] to go where the officers themselves [could] not go and conduct what would otherwise be an unlawful search."

Mason's argument, however, fails to account for the dog's conduct before it entered the vehicle. The district court found as fact that the dog alerted several times on the exterior of the vehicle *before* jumping through the window into the back seat. This finding was supported by testimony at the suppression hearing as well as by the video tape, where the dog can be seen placing her paws on the passenger-side window and moving her head rapidly, consistent with Sergeant Kitchens' description of an alert. These alerts indicated that the dog perceived a narcotics odor while outside the car, thereby creating probable cause to believe that narcotics were present even prior to the dog's entry into the vehicle. *See Branch*, 537 F.3d at 340 n.2 (noting that a "positive alert" from a drug-detection dog provides probable cause to search the vehicle (citing

*United States v. Eura*, 440 F.3d 625, 630 (4th Cir. 2006), and *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994)).

While we therefore need not address Mason's argument that Sergeant Kitchens opened the door or prompted the dog to enter Mason's car, that factual challenge would also fail. The district court found as fact that the dog jumped in the open driver-side window of her own accord and was not commanded by her handler to do so. This finding was supported by testimony at the suppression hearing, as well as by the videotape, and therefore was not clearly erroneous.

## III

While Mason's brief on appeal challenges the reasonableness of Mason's detention only *after* Trooper Swicord issued the warning ticket, when Mason's counsel and the government were questioned by the court at oral argument about whether Trooper Swicord's questioning of Mason and Govan during the traffic stop about matters unrelated to the reason for the traffic stop amounted to an unconstitutional delay or extension of the traffic stop, Mason's counsel argued that it did. Because of how and when the issue arose, there might be good reason to doubt whether Mason preserved the issue for appeal, but we need not decide that question because, we conclude, the argument has no merit.

The facts relevant to this argument are not disputed. Once Mason stepped to the rear of the vehicle during the course of the traffic stop, Trooper Swicord questioned him for less than two and one-half minutes (11:41:20 a.m. to 11:43:34 a.m.), asking him relevant questions as to who owned the car and, when Mason replied that his daughter owned it, what his daughter's name was. Swicord also asked Mason about where he had been, his destination, and the purpose of his trip. After concluding this questioning of Mason, Trooper Swicord walked over to Govan and questioned him for just over one minute (11:43:40 a.m. to 11:44:50 a.m.), during which time

Govan gave a contradicting account of the purpose of their trip. Trooper Swicord then returned to his patrol car, radioed in information in accordance with traffic-stop protocol, and wrote out the warning ticket. From the time that Trooper Swicord began questioning Mason until the time that he finished questioning Govan, a total of three and one-half minutes had elapsed, and most of that time was devoted to questions directly relevant to conducting the traffic stop. Perhaps only one to one and one-half minutes involved questioning on matters unrelated to the traffic stop.

There is no support in Fourth Amendment jurisprudence for the notion that questioning unrelated to the purpose of a traffic stop requires reasonable suspicion, provided that the questioning occurs within the timeframe reasonably necessary to effectuate the traffic stop. An officer's questions or actions during the course of a traffic stop or any other legal detention need not be solely and exclusively focused on the purpose of that detention. In *Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009), a unanimous Supreme Court noted just that:

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. . . . *An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.*

(Emphasis added) (citing *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005)). Similarly in *Mena*, officers questioned a woman about her immigration status while she was handcuffed for safety purposes during the execution of a search warrant. She claimed that the questioning was not necessary for the officers' safety and was therefore unconstitutional. Once again, a

unanimous Supreme Court agreed that the questioning did not violate the Fourth Amendment even though it was wholly unrelated to the justification for her detention. *See Mena*, 544 U.S. at 100-01; *id.* at 105 (Stevens, J., concurring in the judgment).

Thus, when an individual is lawfully stopped for a suspected traffic violation, the officer may briefly ask questions unrelated to the stop. For instance, questions about the weather or simply "How 'bout them Georgia Bulldogs?" do not implicate the Fourth Amendment, provided that the unrelated questioning does not extend the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention. An officer's incidental questions about a motorist's destination and purpose of travel are no different. It has never been held that brief, incidental questioning about matters unrelated to the traffic violation violates the Constitution. *See*, *e.g.*, *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007) ("[A]n officer does not violate the Fourth Amendment by asking a few questions about matters unrelated to the traffic violation, even if this conversation briefly extends the length of the detention" (citing *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006); *United States v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003); *United States v. Childs*, 277 F.3d 947, 951-54 (7th Cir. 2002) (en banc))); *see also United States v. Harrison*, 606 F.3d 42, 44-45 (2d Cir. 2010) (finding no Fourth Amendment violation due to unrelated, separate lines of questioning of a driver and a passenger regarding the purposes of their journey, point of origin, and destination); *United States v. Everett*, 601 F.3d 484, 492-94 (6th Cir. 2010) (relying on *Mena* and *Johnson* in holding that brief questioning unrelated to the purpose of a traffic stop does not violate the Fourth Amendment).

The fact that Trooper Swicord directed one minute of his questioning *to the passenger* does not alter the calculus. *See United States v. Soriano-Jarquin*, 492 F.3d 495, 499-501 (4th Cir. 2007). In *Soriano-Jarquin*, we held that there was no

Fourth Amendment violation when an officer *asked a passenger* for identification, which ultimately led to reasonable suspicion of immigration violations, because the request did not prolong the stop, which was for a broken headlight. We noted, "We believe a simple request for identification from passengers falls within the purview of a lawful traffic stop and does not constitute a separate Fourth Amendment event. Assuming a lawful stop, an officer is entitled to some chance to gain his bearings and to acquire a fair understanding of the surrounding scene." *Id.* at 500.

Of course, a traffic stop may not be extended beyond the time *reasonably* necessary to effectuate the stop, absent reasonable suspicion justifying further detention as a *Terry* stop. *See Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005). In this case, Trooper Swicord went about his business promptly and with efficiency. He completed the entire traffic stop—including the brief questioning, the examination of papers, the calling of his dispatcher to relate information, the testing of the tinted windows, and the issuance of a warning ticket—within a period of less than 11 minutes. The one to two of the 11 minutes devoted to questioning on matters not directly related to the traffic stop constituted only a slight delay that raises no Fourth Amendment concern. *See United States v. Farrior*, 535 F.3d 210, 220 (4th Cir. 2008) (holding that *de minimis* delays in conducting a traffic stop do not violate the Fourth Amendment); *United States v. Alexander*, 448 F.3d 1014, 1017 (8th Cir. 2006) ("'[A] two minute delay . . . is a *de minimis* intrusion on the driver's personal liberty that does not violate the Fourth Amendment'" (quoting *United States v. Martin*, 411 F.3d 998, 1002 (8th Cir. 2005)); *United States v. Purcell*, 236 F.3d 1274, 1279 (11th Cir. 2001) (three-minute delay was *de minimis* and did not violate the Fourth Amendment). And, it cannot be said that the overall length of the 11-minute traffic stop involved an unconstitutional delay. Indeed, on numerous occasions, we have approved longer stops against challenges of unreasonable delay, as have other courts. *See, e.g.*, *United States v. Jeffus*, 22 F.3d 554, 557 (4th

Cir. 1994) (approving 15-minute traffic stop); *United States v. Mincey*, No. 07-4563, 2008 WL 5063872, at *6 (4th Cir. Nov. 24, 2008) (35 minutes); *United States v. Jones*, No. 06-4889, 2008 WL 3863408, at *5-6 (4th Cir. Aug. 20, 2008) (20 minutes); *United States v. Ramirez*, Nos. 01-4147, 01-4161, 2002 WL 27313, at *2 (4th Cir. Jan. 10, 2002) (15 minutes); *Purcell*, 236 F.3d at 1279 (14 minutes); *Olivera-Mendez*, 484 F.3d at 508, 510 (15 minutes).

In sum, the questions posed by Trooper Swicord during the traffic stop that were unrelated to the basis for the stop did nothing to diminish the stop's constitutionality, given that they caused only a brief delay.

## IV

Mason also contends that two separate state drug felony convictions from 1988 were improperly used to enhance his sentence under 21 U.S.C. § 841(b)(1)(A) because he was not represented by counsel in those cases. In support of this contention, he submitted documents from those cases purportedly demonstrating his lack of legal representation, and he undertook to testify on this point at the sentencing hearing. In his testimony, Mason stated that he had been shot in the head in 2001, some 13 years *after* those convictions, leaving him with little or no memory of the events prior to 2001, including events at the time of his state convictions. He stated that he had no memory of being represented by an attorney for either state charge or being advised of his right to counsel. He also testified that he had no recollection of his prior federal conviction in 1993 or of having served 70 months in prison for that conviction.

The district court concluded that Mason did not carry his burden of demonstrating by a preponderance of the evidence that his prior state convictions were uncounseled. *See* 21 U.S.C. § 851(c)(2). None of the documents he offered supported his contention, and his testimony indicated that he was

unable to recall events before 2001. Indeed, based on the evidence, the district court concluded that the record showed affirmatively that Mason was in fact represented during both of those convictions.

Regarding the first, a February 1988 conviction for drug trafficking in Richland County, South Carolina, the charging document submitted by Mason had "Def Screen" written on it, which indicated to the court that Mason had been represented by local defense attorney Jerry Screen. A ledger from Screen's office confirmed that in August 1987, Mason retained Screen to represent him on a charge for cocaine distribution, and this date coincided with the date of Mason's August 1987 arrest for the conduct underlying the February 1988 conviction. Furthermore, this same conviction was used to calculate Mason's sentence for his federal conviction in 1993, without objection from Mason.

Regarding the second state conviction, which occurred in Orangeburg, South Carolina, in July 1988, a form submitted by Mason indicated that he was represented by attorney Charles H. Williams. The indictment reflected this fact as well. And again, consistent with this evidence, the 1993 presentence report for Mason's previous federal charge indicated that Mason was represented during this state conviction, again without objection by Mason.

In short, Mason has failed to carry his burden of demonstrating that the prior convictions were uncounseled.

Moreover, we note that Mason's challenge to the validity of his state convictions was in any event likely barred by the statute of limitations in 21 U.S.C. § 851(e), which provides, "No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction." The two state convictions that Mason challenges occurred

more than five years before the government submitted its § 851 information in this case.

## V

Finally, Mason contends that the fact of his prior convictions needed to be proved to a jury beyond a reasonable doubt. Because that fact was not found by a jury beyond a reasonable doubt, he asserts, the use of the prior convictions to enhance his sentence violated his Sixth Amendment rights. Mason candidly acknowledges that this argument is presented for purposes of preserving the issue for the Supreme Court and that, under the present jurisprudence of *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), such an argument cannot be sustained. We agree. Moreover, we note that since *Almendarez-Torres*, the Supreme Court has repeatedly affirmed the exception, as have we. *See Shepard v. United States*, 544 U.S. 13, 25-26 & n.5 (2005); *Apprendi v. New Jersey*, 530 U.S. 466, 488-90 (2000); *United States v. Cheek*, 415 F.3d 349, 354 (4th Cir. 2005).

\* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

In my view, Trooper Blake Swicord violated Victor Mason's Fourth Amendment rights by extending the length and scope of Mason's detention beyond that which was necessary for a routine traffic violation, without reasonable suspicion to believe that any further illegal activity was afoot. Therefore, I respectfully dissent.[1]

---

[1]Because I would hold that Trooper Swicord violated Mason's Fourth Amendment rights by unreasonably delaying his detention, and that any

I.

Regrettably, I must begin by supplementing and clarifying some key facts about Trooper Swicord's detention of Mason that are omitted by the majority.[2]

At approximately 11:40 AM, Trooper Swicord signaled for Mason to pull over based on his suspicion that the tint on Mason's windows was too dark, in violation of Georgia law. According to Swicord, Mason did not begin to pull over during these one-to-two seconds, which immediately aroused his suspicion. Though it is clear from the video of the stop that Mason was in the process of pulling over as soon as the tape began, Swicord testified that there was a one-to-two second delay between the time he activated his blue light and the time the dashboard camera began recording. During this time, Swicord also noticed that Mason had turned to his passenger, Govan, which the officer also deemed suspicious. When Swicord approached the car and began talking to Mason, he noticed a strong smell of air freshener, noticed that the key in the ignition was on a keychain with no other keys, and that there was no luggage in the backseat.

At the suppression hearing, Trooper Swicord testified on cross-examination that based on his "experience," he was suspicious that criminal activity was afoot as soon as he pulled over Mason's car. J.A. 95. He agreed with defense

---

evidence seized as a result of the delay should have been excluded at his trial, I do not consider whether Swicord had probable cause to search Mason's trunk at the stop's conclusion. But to the extent reasons given by Swicord were constitutionally insufficient or inappropriate to justify reasonable suspicion to extend Mason's stop, they would likewise not justify probable cause to search Mason's car.

[2]These facts are gathered from both Trooper Swicord's testimony at the suppression hearing and the video of the stop taken by his dashboard camera, which was submitted by the parties as part of the Joint Appendix.

counsel's assertion that his suspicion was based on "sort of gut instinct." *Id.*

After an initial discussion with Mason about why he was pulled over, Trooper Swicord ordered Mason out of the vehicle. Standing by the side of the highway, Swicord proceeded to ask Mason a series of questions about where Mason was coming from, where he was going, and the purpose of his travel. During this time, the officer testified that Mason was

> [n]ot making eye contact, shifting his weight. It's hard to explain in the sense that if you've ever looked into the eyes of a person that's looking at the rest of their life in prison they have a certain look about them. And fear is hard to explain in that sense. But when you are looking at a person that is fearful it's just a different look that every officer that I know understands.

J.A. 99. Trooper Swicord's testimony that Mason was "not making eye contact" is contradicted by video of the stop, which shows Mason looking at the officer throughout the questioning, while the officer looks away.

After completing his questioning of Mason, Trooper Swicord then repeated the same questions to Govan. This encounter lasted a bit more than one minute. When Govan gave a conflicting account of the purpose of the trip, the officer returned to his patrol car and radioed for a K-9 unit to come to the scene. He told the dispatcher, "When you get through with that [inaudible], come on over to me right here, I got something right here, these guys are spooky *spooky*."

On direct examination, the attorney for the government asked Trooper Swicord why he called for K-9 backup. He replied, somewhat bizarrely:

> I have been in a lot of violent confrontations coming out of Atlanta. Mr. Mason and Mr. Govan are older

> black males that are not in good shape, I didn't feel
> like they would challenge me physically. I felt like
> if they had a gun we were probably fixing to shoot
> it out.

J.A. 89. When then asked whether this was based on his observations of Mason and Govan, the officer responded, "that's based on experience." *Id.*

Once he requested backup, Trooper Swicord then returned to Mason's vehicle to test the window tint. After doing so, he went back to his patrol car and again radioed dispatch. This time, he asked the dispatcher to check whether there were any outstanding warrants for Mason or Govan's arrest. Curiously, the officer told the dispatcher to hold the information, rather than run the check immediately.

When the K-9 unit arrived, Trooper Swicord testified that the drug-sniffing dog alerted to the presence of drugs in Mason's trunk. The officer then searched the trunk and found 10 kilograms of cocaine. Mason and Govan were then arrested. The detention, as measured between the time Trooper Swicord stopped Mason's car and the time he arrested Mason and Govan, lasted 18 minutes.

Prior to trial, Mason moved to suppress the drugs found in his car on the grounds that Trooper Swicord lacked reasonable suspicion to extend the stop beyond that which was necessary to cite him for a window-tint violation and on the grounds that he lacked probable cause to search the trunk. The district court denied Mason's motion on both grounds. Mason then proceeded to trial where he was convicted of possession with intent to distribute five kilograms or more of cocaine and subsequently sentenced to life imprisonment.

II.

In light of these facts, there can be no doubt that Trooper Swicord extended Mason's detention beyond what was neces-

sary to issue him a warning for a window-tint violation. When Swicord ordered Mason out of the car and questioned him about matters wholly unrelated to the window tint and then repeated the same questioning to Govan, the prolonged detention was not justified by probable cause to believe that the motorists had committed a traffic infraction.

Therefore, in order for the detention to comply with the Fourth Amendment, Swicord either had to have reasonable suspicion to believe that criminal activity was afoot when he prolonged his investigation, *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008), or his questioning must not have "measurably extend[ed] the duration of the stop," *Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009). Because Swicord lacked reasonable suspicion that criminal activity was afoot when he extended the stop, and because that extension was "measurabl[e]" when viewed under the totality of the circumstances, Swicord violated Mason's Fourth Amendment rights.

A.

When conducting a routine traffic stop, a police officer may not detain the driver or passenger beyond the point necessary to effect that stop without reasonable suspicion to believe that either is engaged in additional criminal activity. *Branch*, 537 F.3d at 336; *see Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."). Reasonable suspicion, though incapable of a precise definition, must consist of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" further governmental intrusion upon an individual's liberty. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). These specific, articulable facts will not support reasonable suspicion, however, if they "describe a very large category of presumably innocent travelers." *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam). Nor can an officer's suspicion be based on merely

"'inchoate and unparticularized suspicion or hunch.'" *Branch*, 537 F.3d at 336 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

After reviewing Trooper Swicord's testimony and video of the stop, it is abundantly clear that he lacked reasonable suspicion at the point he ordered Mason out of the car and that he lacked the requisite suspicion until, at very least, he completed his conversation with Govan.**[3]** Swicord repeatedly stated in his testimony that he believed Mason possessed drugs based on his "experience" and that he knew as soon as he pulled Mason over that he was transporting drugs simply based on "gut instinct." He stated that he knew Mason was carrying drugs just by "look[ing] into [his] eyes," even though he could not provide any objective facts to justify this suspicion. On the video, Swicord gave no reason for requesting drug-sniffing dogs beyond stating that "these guys are spooky *spooky*." When asked by the government why he called for K-9 backup, Swicord gave a soliloquy about the propensity for violence of "older black males that are not in good shape" coming from Atlanta. And only after twice being asked by the government whether this was based on his actual observations of Mason and Govan did he say that it was, in addition to his "experience." In short, Trooper Swicord was playing a "hunch" based on no more than "inchoate and unparticularized suspicion" when he extended the stop by questioning Mason and Govan about matters unrelated to the window-tint violation. *Branch*, 537 F.3d at 336 (quoting *Wardlow*, 528 U.S. at 124).

Likewise, those objective factors listed by the government are classically impermissible, post-hoc rationalizations that cannot justify reasonable suspicion because they fail to exclude "a very large category of presumably innocent travel-

---

**[3]**At that point, as the majority's opinion in Part II notes, Trooper Swicord had conflicting statements from Mason and Govan about the nature and purpose of their trip.

ers." *Reid*, 448 U.S. at 441. Swicord testified that prior to his questioning Mason and Govan he was suspicious because of (1) Mason's one-to-two second delay in pulling over; (2) Mason's looking in the direction of his passenger; (3) the fact that there was a strong smell of air freshener in the car; (4) the fact that Mason was driving away from Atlanta; (5) the fact that there was only one key in the ignition; and (6) the fact that there was no visible luggage in the backseat. Yet Swicord failed to articulate why any of these factors would be associated with criminal activity. In other words, Swicord provided "articulable" facts, yet provided no basis for why these factors were "suspicious" individually or in the aggregate. *Cf. Terry*, 392 U.S. at 21.

Regarding the one key in the ignition, for example, Trooper Swicord stated that it suggested to him that the car was borrowed.[4] Because it was borrowed, he stated, there was no house key. "And the reason there's no house keys," he stated, "is because there's criminal activity being pursued and no one wants to be linked to the car or criminal activity." J.A. 84. Swicord gave no further basis, either in logic or his professional experience, for the supposed link between lack of house keys and criminal activity.

Likewise, Trooper Swicord stated that as he approached the vehicle he noticed that there was no luggage in the backseat, which he testified immediately made him suspicious that Mason was on a turn-around trip from Atlanta to buy and sell drugs.[5] Yet there was no reason why Mason and Govan could not have placed their luggage in the car's trunk.

More problematically, though, this statement is quite obvi-

---

[4]Mason had indeed borrowed the car from his daughter, a fact Trooper Swicord confirmed during the stop.

[5]I leave it to others to surmise how Trooper Swicord could determine whether or not there was luggage in the backseat of Mason's car as he approached the overly tinted windows.

ously post-hoc and not based on Swicord's real-time observations. At the time he approached the car, Swicord had no idea of where Mason and Govan were coming from or any reason to suspect that their travels reasonably required luggage — he only learned about the nature of their trip after questioning them separately. Far from providing reasonable suspicion at the time of the questioning, then, the factors listed by Swicord can only be reasonably viewed as attempts to justify his unsupported, "gut instinct" after-the-fact. "[A]n objective assessment of an officer's actions in light of the facts and circumstances then known to him," simply cannot support Swicord and the government's insistence, after-the-fact, that he had a reasonable basis for suspicion as soon as he stopped Mason. *See United States v. Rooks*, 596 F.3d 204, 210 (4th Cir. 2010) (quoting *Scott v. United States*, 436 U.S. 128, 137 (1978)).

It is true, of course, that our review of Trooper Swicord's suspicion must be "holistic," *Branch*, 537 F.3d at 337, and that in certain circumstances "wholly lawful conduct might justify the suspicion that criminal activity was afoot," *Reid*, 448 U.S. at 441.[6] Not so here. Even when viewed holistically, the facts listed at varying times by Trooper Swicord and argued by the government simply do not exclude enough innocent travelers to justify reasonable suspicion. *See id.* At oral argument, the government conceded that every factor that it used to justify reasonable suspicion could apply to either every car on I-20 or at least millions of them. If police offi-

---

[6]The facts in *Reid* are remarkably similar to those here. In *Reid*, an agent for the Drug Enforcement Administration stopped two passengers in an Atlanta airport who had arrived on an early morning flight from Fort Lauderdale. 448 U.S. at 439. The agent was suspicious because the two men had stayed in Fort Lauderdale for only one night, appeared nervous, were looking at each other strangely as they got off the plane, were carrying shoulder bags, and arrived at a time when they could reasonably believe there would not be law enforcement present. *Id.* The Supreme Court held that these factors did not support a finding of reasonable suspicion. *Id.* at 441.

cers could justify a full investigative detention of every car that took one second to pull over, in which the driver looked in the passenger's direction, had air freshener, had no luggage, and was driving away from Atlanta (and presumably to or away from any "source" city in the country), then courts would in essence constitutionally bless "virtually random seizures" on every highway on the east coast. *See id.* Searches and seizures based on so "slender a reed" cannot possibly be reasonable in any meaningful sense. *See id.* Consequently, Trooper Swicord did not have reasonable suspicion to extend the stop when he ordered Mason out of the car.[7]

## B.

The majority does not argue that Trooper Swicord had reasonable suspicion to extend the stop to include unrelated questioning of Mason and Govan at the time Swicord ordered Mason out of the car. Instead, the majority argues that Swicord did not "measurably extend the duration of the stop," *Johnson*, 129 S. Ct. at 788, because the delay was *de minimis*, or as he calls it, "only a slight delay." In other words, the majority interprets the prohibition against "measurably"

---

[7]The following example illustrates the absurdity in finding reasonable suspicion based on the factors listed by the government:

While running errands with her child, a mother is pulled over on I-20, just north of the Savannah River. It takes her one second to pull over to the right-side emergency lane and while doing so, she looks to the right, which also happens to be where her child is sitting. She has cherry-flavored air freshener hanging from her rearview mirror. She has one key in the ignition because her key, like many keys on modern vehicles that also electronically lock and unlock car doors, is too big to fit on standard-issue key chains. And she has no luggage in the backseat because, like most people travelling to the grocery store, she does not plan to spend the night.

A police officer's decision to then detain the woman and her child to investigate them for drug trafficking would be patently unreasonable. And the reasonable suspicion analysis does not change with the gender, race, or ethnicity of the motorists.

extending a traffic stop to allow, as a bright-line rule, any extension of at least three-and-a-half minutes.**[8]** Under well-established Fourth Amendment jurisprudence, this is incorrect.

"'The touchstone of the Fourth Amendment is reasonableness.'" *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)). In conducting the reasonableness analysis, we are instructed to look at the "totality of the circumstances" and "eschew[ ] bright-line rules" in favor of a "fact-specific" analysis. *Id.* Therefore, in analyzing whether an officer impermissibly extended the duration of a traffic stop without reasonable suspicion, "we must conduct a fact-bound, context-dependent inquiry in each case" that looks to whether the prolonged period was reasonable in light of the stop as a whole. *United States v. Everett*, 601 F.3d 484, 493 (6th Cir. 2010).

In *Everett*, a case upon which both the government and the majority rely, the Sixth Circuit rejected the argument that any prolongation period could be deemed categorically *de minimis*. *Id.* Instead, in a thoughtful and extensively reasoned opinion by Judge Boggs, the court focused its inquiry on whether the challenged delay bespoke a lack of diligence on the part of the investigating officer in making the traffic stop. *Id.* at 494. Specifically, the court articulated a set of factors to consider, including: (1) the nature of any extraneous questions asked by the investigating officer; (2) whether or not the additional intrusion was conducted out of concern for officer safety; and (3) whether the "'questions unrelated to the traffic violation constituted the bulk of the interaction between the trooper and the motorist'" or whether the officer could be deemed to have "definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of

---

**[8]**The majority's repeated insistence that the delay was only "one-to-two minutes" is simply inaccurate.

investigation." *Id.* at 495 (quoting *United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008)).

Here, the extraneous questioning was extensive in scope. Trooper Swicord, after ordering Mason out of his vehicle, proceeded to ask him roughly a dozen questions about the nature and purpose of his travel, wholly unrelated to his windows' tint. Swicord repeated several of the questions throughout the exchange, trying to induce Mason into contradicting himself in order to gain reasonable suspicion to further extend the stop.[9] Swicord then similarly engaged Govan, asking him where he stayed, whom he was visiting, and even what time he woke up in the morning. The only possible justification for the repeated and extensive questions to both passengers was to create conflicts in their stories so that Swicord could justify continuing the stop and expanding his investigation. Swicord even admitted as much when he stated that he asked "clarifying questions" of Mason and Govan because subjectively, he "was 100 percent sure they were drug trafficking." J.A. 108. Though it may be true that isolated questions about a suspect's itinerary may be permissible to allow the officer to get a better sense of the circumstances he confronts, *Everett*, 601 F.3d at 494, Swicord's questions to Mason and Govan were a fishing expedition, designed solely to investigate possible criminal activity.

Likewise, none of Trooper Swicord's questioning was at all related to officer safety. He neither asked Mason or Govan whether they were carrying weapons, nor did he ever pat them down while speaking with them. Indeed, he even let Govan stay in the car while he spoke with Mason, demonstrating that he was not afraid that there were weapons in the car with which either suspect could harm him or other officers.[10]

---

[9]At no point during the exchange did Mason, in fact, contradict himself.

[10]Given Trooper Swicord's clear lack of concern for his safety when talking to Mason and Govan, his subsequent testimony that he requested K-9 backup because he feared the motorists were armed and violent, being as they were older black men leaving Atlanta, J.A. 89, is all the more bizarre.

Finally, the unrelated questioning was so extensive as to demonstrate that Trooper Swicord's primary purpose in effecting the stop was not to write a warning for a window-tint violation but instead to investigate other criminal activity. Eleven minutes elapsed between the time Swicord signaled for Mason to pull over and the time he wrote him a warning for the traffic violation. But of those eleven minutes, video of the stop reveals that Trooper Swicord spent no more than two minutes actually investigating and writing a warning for the window-tint violation. Indeed, that amount of time is significantly less if one considers only the period of time between Swicord's signaling for Mason to pull over and the point at which he finished questioning Govan; the point at which the majority agrees (and I assume for purposes of argument) that Swicord had reasonable suspicion to extend the stop. Swicord, therefore, spent "the bulk of the interaction" with the motorists investigating a crime for which he had no reasonable suspicion, demonstrating a clear lack of diligence in resolving the traffic violation. *Id.* at 495.[11]

Under the totality of the circumstances, then, Swicord violated Mason's Fourth Amendment rights by unreasonably delaying Mason's detention to question him about unrelated matters. Thus, the district court erred in denying Mason's motion to suppress the drugs found as the result of the unreasonable delay. Mason's conviction should therefore be reversed.

### III.

Victor Mason was denied justice when a police officer targeted him for extended detention based on a hunch and his gut instinct regarding people travelling on I-20. That the offi-

---

[11]Perhaps no single fact demonstrates Trooper Swicord's lack of diligence more than his request that the dispatcher hold any information regarding outstanding warrants for Mason and Govan until he had further opportunity to investigate their behavior.

cers ultimately seized several kilograms of cocaine neither vindicates violating the Fourth Amendment nor lessens our duty to adjudicate justly the rights enshrined therein.